**Hoi Man YUNG, Petitioner,**

v.

**Hans WALKER, and Eliot L. Spitzer, Respondents.**

No. 00 Civ. 1263.

United States District Court, S.D. New York.

April 17, 2001.

The Legal Aid Society, Criminal Appeals Bureau, New York City, by M. Sue Wycoff, of counsel, for Petitioner.

Honorable Eliot L. Spitzer, Attorney General of the State of New York, New York City, by Tiffany M. Foo, Assistant Attorney General, of counsel, for Respondents.

## OPINION

SWEET, District Judge.

Petitioner Hoi Man Yung ("Yung"), a prisoner in state custody, has filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254 alleging that the trial court's decision to close the courtroom to his family members during the testimony of an undercover officer violated his Sixth Amendment right to a public trial. For the reasons set forth below, the petition will be granted and the case remanded with instructions to release Yung unless a new trial is held within a reasonable time.

### Facts

In 1993, Yung was indicted on multiple counts each of first-degree criminal sale of a controlled substance, criminal possession

of a controlled substance in the third degree, criminal sale of a firearm in the third degree, and criminal possession of a firearm in the third degree.

The prosecution's case involved the testimony of an undercover police officer who, at the time of trial, was continuing to work in an undercover capacity in the same Lower East Side neighborhood where Yung and his confederates had been involved in the illicit drug and weapons trade. Seeking to ensure the officer's safety and that his identity would not be divulged, the prosecution sought to have the officer testify by badge number rather than by name, and to close the courtroom to Yung's family during his testimony.

New York Supreme Court Justice Ronald Zweibel held a hearing pursuant to *People v. Hinton*, 31 N.Y.2d 71, 75–76, 334 N.Y.S.2d 885, 889–90, 286 N.E.2d 265 (1972), to determine whether such protective measures were warranted, and if so, their appropriate scope. On November 18, 1994, the courtroom was sealed and the officer testified in the presence of only the judge and counsel. The officer testified that he continued to work on two pending investigations in the neighborhood where Yung had operated, had been threatened by unnamed "people connected with" Yung, most recently approximately nine months before the hearing, and feared for his safety if the courtroom were not closed during his trial testimony. (Hearing Tr. 691, 692, 699.) The only person he cited as having threatened him was in the midst of an ongoing trial at the time the officer testified, and was not a member of Yung's family. (Hearing Tr. 711.) No questions were asked regarding whether the individual was in custody or whether that trial was being held in the same courthouse as Yung's trial, or whether that individual was in custody.

The officer, who was called and identified by his shield number (# 1022) rather than his name, stated that in his nine years as an undercover officer, he had testified approximately forty times, all of which had been in closed courtrooms. He testified that he used his true first name in the field and would no longer be able to operate as an undercover officer if his identity were revealed in open court. (H 692, 706.) No testimony was elicited regarding what measures, if any, the officer took to avoid being identified while inside the courthouse.

On cross examination, defense counsel attempted to elicit the names of the associates of Yung who had threatened the officer, but Justice Zweibel cut off that line of questioning, stating that he would allow only those questions that "do not jeopardize the safety and security of the officer. If it means perhaps compromising the defendant's rights to the extent of not revealing the officer's identity to others that he's associated with then I will not permit the hearing to go that far." (Hearing Tr. 692, 693–95.) When defense counsel challenged the existence of any link between disclosing the identity of persons who had threatened the officer and a threat to his safety, Justice Zweibel replied, "I understand. But you want the names of individuals who perhaps can be told at a later point who the undercover allegedly claims threatened him, so that they will know who this undercover is while he is out in the field." (Hearing Tr. 696.)

The defense noted that whether the undercover officer could be identified should not be a consideration, because he would necessarily disclose his identity when he testified in Yung's presence at trial. Justice Zweibel discounted this argument and refused to allow the defense to pursue any questions that could lead to the officer's

identity being revealed. (Hearing Tr. 697.)

When asked whether he had any "reason to fear" Yung's family members,[1] the officer responded, "I can't really answer that," and referred only to the unnamed individual from whom he had received threats, who was not related to Yung, but was merely "affiliated" with him. (Hearing Tr. 710, 711.) However, the officer did admit that he had never been threatened by any member of Yung's family. (Hearing Tr. 708.) No questions were asked to ascertain whether Yung's family lived in the same Lower East Side neighborhood where the officer conducted undercover operations.

Justice Zweibel found that the prosecution had shown sufficient danger to the officer's undercover identity and safety to justify closing the courtroom to Yung's family members at trial, not because they posed any direct threat to the officer, but because allowing them to be present would "mak[e] it easier" for others Yung was associated with outside the family to identify him. As a result, in addition to Yung's brother, David, Yung's mother, Ha Chung Yuk, his sister-in-law, Theresa Soto, and his daughter's mother, Beverly Soto, were all excluded from the trial during the undercover's testimony. Although colleagues of Yung's counsel were specifically authorized to attend, the courtroom was otherwise closed to the general public during the officer's trial testimony. (Hearing Tr. 33; Tr. 720.)

At the trial, the People presented evidence from the undercover officer who purchased narcotics and weapons from Yung, as well as testimony from a second police officer, who was the undercover's backup and received the recovered firearms. In addition, a detective and firearms examiner, three New York City Police Department chemists, and two additional civilian chemists testified as to the firearms and composition of the heroin and cocaine in Yung's possession. Yung was the only witness who testified for the defense.

The jury convicted Yung of two counts of criminal sale of a controlled substance in the first degree; nine counts of criminal sale of a firearm in the third degree; five counts of criminal possession of a weapon in the third degree; and three counts of criminal sale of a controlled substance in the third degree. Yung was sentenced to two consecutive terms of twenty years to life, to be served consecutively to two groups of concurrent sentences, each containing concurrent terms of two to six and one to three years, and also to be served consecutively to three additional consecutive sentences of two to six years each. In short, Yung received a fifty years to life prison term.

### Procedural History

Assisted by attorneys from the Legal Aid Society, Yung appealed the conviction on the grounds that closing the courtroom to his family during the undercover officer's testimony violated his public trial rights under the Sixth and Fourteenth Amendments to the United States Constitution and New York law, and that Justice Zweibel had abused his sentencing discretion. The Appellate Division held that the courtroom was properly closed after the People established "particularized reasons for concern that defendant's relatives

---

1. Defense counsel specifically excluded Yung's brother, David, from this line of questioning, because David had been arrested on the same charges as Yung, and subsequently released. Defense counsel conceded that the evidence of David's involvement in the same crimes would be sufficient grounds on which to exclude him from the courtroom while the undercover officer testified in Yung's trial. (Hearing Tr. 708–10, 715–16.)

posed a threat to his safety by revealing his identity" at the *Hinton* hearing, and affirmed the conviction. *People v. Hoi Man Yung*, 240 A.D.2d 252, 252, 659 N.Y.S.2d 733, 733 (N.Y.App.Div.1997).

The New York Court of Appeals denied Yung's application for leave to appeal on September 24, 1997. *People v. Hoi Man Yung*, 90 N.Y.2d 940, 664 N.Y.S.2d 758, 687 N.E.2d 655 (1997) (Titone, J.). Yung petitioned for reconsideration of the denial of leave in light of the intervening reversal of *People v. Nieves*, 232 A.D.2d 305, 648 N.Y.S.2d 583 (N.Y.App.Div.1996), by the Court of Appeals, which vacated a defendant's conviction and ordered a new trial because his family had been excluded from part of the trial. *People v. Nieves*, 90 N.Y.2d 426, 683 N.E.2d 764, 660 N.Y.S.2d 858 (N.Y.1997). The Court of Appeals again denied Yung leave to appeal on October 23, 1997. *People v. Hoi Man Yung*, 90 N.Y.2d 1012, 666 N.Y.S.2d 107, 688 N.E.2d 1390 (1997) (Titone, J.).

Yung then filed a pro se motion to vacate the judgment pursuant to New York's Criminal Procedure Law § 440.10, arguing that his Sixth Amendment public trial right was violated when his family was excluded from the questioning of the undercover officer by telephone in the presence of both counsel,[2] and that his attorney's failure to inform him of his right to be present for that conversation constituted ineffective assistance of counsel. Justice Zweibel denied the motion on May 19, 1999. Yung's motion for leave to appeal that order was denied by the Appellate Division, First Department, without decision, on September 30, 1999.

Legal Aid Society counsel filed the instant petition on Yung's behalf on February 18, 2000. The sole constitutional question raised was whether sufficient evidence had been presented that the excluded family members presented any danger to the undercover to justify closing the courtroom to them in light of Yung's Sixth Amendment right to a public trial. The State filed briefs in opposition to the petition on August 23, 2000 and November 8, 2000. The motion was deemed fully submitted after oral argument on December 13, 2000.

## Discussion

### I. Legal Standard for Habeas Corpus Pursuant to § 2254

#### A. Standard for Reviewing State Court Judgments

■ The 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA") provides a federal remedy for state prisoners if their continued custody is in violation of federal law. Pub.L. No. 104–132, 100 Stat. 1214, codified at 28 U.S.C. § 2254(a); *see Chandler v. Florida*, 449 U.S. 560, 571, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981) ("This Court has no supervisory authority over state courts, and, in reviewing a state court judgment, we are confined to evaluating it in relation to the Federal Constitution."). Errors of state law are not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Petitioners bear the burden of proving violations of federal law by a preponderance of the evidence. *See Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir.1997).

**2.** The claim asserted that the undercover officer had been questioned by telephone, although the transcript of the *Hinton* hearing suggests that the officer was physically present in the courtroom during his testimony. (Hearing Tr. 711 ("Thank you. You may step down.").)

Federal habeas courts must presume state courts' factual findings to be correct, 28 U.S.C. § 2254(e)(1), and may not grant relief unless they find that the state court's adjudication of the merits of the claims either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2); *see Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000).

## B. *Adequate and Independent State Grounds*

 Federal habeas relief is barred where the state court judgment rested on "adequate and independent state grounds." *See Coleman v. Thompson,* 501 U.S. 722, 726, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 261–62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Wedra v. Lefevre,* 988 F.2d 334, 338–39 (2d Cir.1993). This doctrine arises "[b]ecause of comity and federalism concerns and the requirement that States have the first opportunity to correct their own mistakes." *Epps v. Commissioner of Correctional Servs.,* 13 F.3d 615, 617 (2d Cir.), *cert. denied,* 511 U.S. 1023, 114 S.Ct. 1409, 128 L.Ed.2d 81 (1994).

 In order to bar federal habeas review, a state court judgment must include a "plain statement" that "clearly and expressly" states that the "judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's

decision," even if the state court judgment also considers federal law. *Harris,* 489 U.S. at 260, 109 S.Ct. 1038 (citations and internal quotations omitted); *see Wainwright v. Sykes,* 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ("As to the role of adequate and independent state grounds, it is a well-established principle of federalism that a state decision resting on an adequate foundation of state substantive law is immune from review in the federal courts"). After *Harris,* federal habeas courts reviewing state prisoner claims "will presume that there is no independent and adequate state ground for a state court decision when the decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman v. Thompson,* 501 U.S. 722, 734–35, 111 S.Ct. 2546, 2556, 115 L.Ed.2d 640 (1991) (*quoting Michigan v. Long,* 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983)).

The state argues in passing that Yung's claim is barred because the trial court and state court relied on adequate and independent state grounds. (Resp. Supp. Br. at 2–3.) However, although the trial court relied only on *Hinton,* and the Appellate Division cited only three New York cases, *Hinton, Nieves,* and *People v. Abdul–Aziz,* 216 A.D.2d 77, 628 N.Y.S.2d 272 (N.Y.App. Div.1995), leave denied, 86 N.Y.2d 788, 632 N.Y.S.2d 502, 656 N.E.2d 601 (1995), none of those cases clearly stated that they relied on state law. In fact, these opinions addressed the public trial question under the rubric of both state and federal law. Specifically, the *Hinton* court considered the Sixth Amendment of the United States Constitution, as made applicable to the states by the Fourteenth Amendment, as well as United States Supreme Court pre-

cedent construing the public trial right arising thereunder. *See Hinton,* 31 N.Y.2d at 73 & n. \*, 334 N.Y.S.2d 885, 286 N.E.2d 265. In *Nieves* and *Abdul–Aziz,* the Appellate Division relied on *Hinton* and other cases construing the Sixth Amendment. *Nieves,* 90 N.Y.2d at 429, 683 N.E.2d at 766, 660 N.Y.S.2d at 860 ("While a defendant's Sixth Amendment right to a public trial may give way to other rights or interests, the Supreme Court of the United States and this Court have repeatedly cautioned that trial courts should exercise their discretionary power to exclude members of the public sparingly and only after balancing the competing interests 'with special care' "); *Abdul–Aziz,* 216 A.D.2d at 78, 628 N.Y.S.2d 272 (*citing Hinton* and other state cases citing the Sixth Amendment).

Therefore, because federal law was interwoven with state law in the opinions below, the adequate and independent state grounds doctrine does not preclude review of the Sixth Amendment claim raised here. *See Coleman,* 501 U.S. at 734–35, 111 S.Ct. at 2556.

## II. *The Sixth Amendment Public Trial Right*

█ The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial...." U.S. Const. Amend. VI; *Duncan v. Louisiana,* 391 U.S. 145, 148 & n. 10, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (holding that right to public trial applies to states through the Fourteenth Amendment). However, while fundamental, this right is not absolute, and may be qualified by a showing of sufficiently important countervailing interests. *See Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Bowden v. Keane,* 237 F.3d 125, 129 (2d Cir.2001).

The Supreme Court held in *Waller* that a courtroom may be closed to the public over a defendant's objection only if four factors are met: (1) "the party seeking to close the hearing ... advance[s] an overriding interest that is likely to be prejudiced;" (2) "the closure ... is no broader than necessary to protect that interest," (3) "the trial court ... consider[s] reasonable alternatives to closing the proceeding, and" (4) "[the trial court] make[s] findings adequate to support the closure." *Waller,* 467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31.

█ In this Circuit, "the more extensive the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Ayala,* 131 F.3d at 70. The extent of closure depends on its duration, the importance of testimony taken while the courtroom was closed, the relationship of the excluded persons to the accused, the public's right of access to the proceedings, and the availability of transcripts or some other mechanism by which to report the testimony. *See English v. Artuz,* 164 F.3d 105, 108 (2d Cir.1998) (citations omitted); *Bowden,* 237 F.3d at 129. Where the closure sought is only partial, the moving party need show only a "substantial reason," rather than an "overriding interest," to satisfy *Waller's* first factor. *Guzman v. Scully,* 80 F.3d 772, 775 (2d Cir.1996) (*citing Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992)).

█ However, this relaxed standard for partial closure is balanced by the higher protection afforded to a criminal defendant's right to have his family present during the proceedings. The "Supreme Court has specifically noted a special concern for assuring the attendance of family members of the accused." *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994) (*citing In re Oliver,* 333 U.S. 257, 271–72

& n. 29, 68 S.Ct. 499, 506–07 & n. 29, 92 L.Ed. 682 (1948)). In addition, a defendant who demonstrates that his family members were excluded from the proceedings without sufficient justification need not show prejudice, and should be granted habeas corpus relief. *English*, 164 F.3d at 108 (citing *Guzman*, 80 F.3d at 776).[3]

### A. *Waller 1: Substantial Reason for Closure*

■ The State argues that the courtroom was only "partially closed" because it was sealed only during the undercover officer's testimony and transcripts were made, and that the lower "substantial reason" standard should therefore apply. Yet the duration of the testimony, its importance to the prosecution's case, and the fact that Yung's family members were specifically removed indicate that closure was more extensive, and that the more rigorous "overriding interest" standard should be applied.[4] Although Detective Edward Rendos videotaped the undercover's interactions with Yung on two occasions, and the undercover wore a concealed audio wire each time he made a transaction with Yung (*see, e.g.,* Nov. 17, 1994 Tr. 740, Nov. 18, 1994 Tr. 25), the undercover's testimony was an important component of the prosecution's evidence, lasting for almost two of the four full days on which the People presented their case.[5]

■ The government presented two reasons for closing the trial to Yung's family during the undercover's testimony: (1) the interest in protecting the officer's identity so he could continue to operate undercover; and (2) the officer's safety. The mere fact that a police officer works in an undercover capacity is insufficient reason to close a courtroom during his testimony. *Brown v. Kuhlmann*, 142 F.3d 529, 538 (2d Cir.1998). However, either the interest in maintaining the effectiveness of an officer's undercover identity or the interest in guarding his safety is a substantial, and even overriding interest that satisfies the "interest" element of the first *Waller* factor. *See, e.g., Ayala*, 131 F.3d at 72 ("The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest"); *United States ex rel. Lloyd v. Vincent*, 520 F.2d

---

3. A defendant's friends have historically received the same heightened Sixth Amendment protection. *See, e.g., In re Oliver*, 333 U.S. at 271–72, 68 S.Ct. 499 ("[W]ithout exception all courts have held that an accused is at the very least entitled to have his friends, relatives, and counsel present, no matter with what offense he may be charged."); *English v. Artuz*, 164 F.3d at 108 ("The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly."). Therefore, the Court need not split hairs as to whether the mother of a defendant's child qualifies as his "family." In any case, the three women excluded from Yung's trial will be referred to as his "family members."

4. In *Humphries v. Garvin*, No. 96 Civ. 2910(AGS), 1997 WL 91064 (S.D.N.Y. March 3, 1997), the Honorable Allen G. Schwartz noted that "the partial closure designation has generally been applied where specific individuals have been excluded from the courtroom during the testimony of a witness who feels intimidated by them," not in cases where the courtroom has been closed only during the testimony of an undercover officer. 1997 WL 91064, at *3.

5. The undercover officer's testimony began after the *Hinton* hearing, opening statements, and the brief testimony of Detective Rendos on November 18, 1994 (Tr. 2), continued through Monday, November 22, 1994 (Tr. 142–225), and concluded in the mid-morning of Tuesday, November 23, 1994 (Tr. 295, 296.) The trial was suspended for the Thanksgiving holiday, resumed on November 28, 1994 (Tr. 316), and continued on November 29, 1994 (Tr. 393), when Yung testified for the defense. Closing arguments took place on December 1, 1994. (Tr. 606.)

1272, 1274–75 (2d Cir.1975) ("shielding the identity of a police witness, preserving his future usefulness, and safeguarding his life provides an adequate justification for excluding the public for that limited period while an undercover agent is testifying.").

## B. *Waller 2: Narrow Tailoring of Closure*

■■■■■ The prosecution must also establish a nexus between the interests sought to be protected and the likelihood that they will be compromised. Thus, *Waller* is met only "*if* the state establishes a substantial probability of prejudice to that interest in the absence of closure" at a pretrial hearing. *Okonkwo v. Lacy,* 104 F.3d 21, 25 (2d Cir.1997) (emphasis in original). *See also Brown v. Andrews,* 180 F.3d 403, 407–08 (2d Cir.1999) (requiring a "specific connection" between threat and testimony); *Ayala v. Speckard,* 131 F.3d 62, 69 (2d Cir.1997) (en banc) (requiring "persuasive evidence of serious risk to an important interest" in order to justify partial closure of a courtroom), *cert. denied,* 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 747 (1998).

Other than the single threat nine months earlier from a person not related to Yung and who was on trial during Yung's trial, the undercover officer in Yung's case testified only to a generalized fear that his identity would be disclosed, and his safety thereby compromised, if the courtroom were not closed during his trial testimony. In addition, he testified that he had pending cases in the same Lower East Side neighborhood where Yung had been arrested and planned to continue working there in an undercover capacity.

In *Ayala,* a case in which the general public was excluded from trial, the Second Circuit held that "[t]here is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity." 131 F.3d at 72. Thus, the showing made in Yung's case might have been sufficient if only the general public were to have been excluded. *See Bowden,* 237 F.3d at 130 ("A narrow courtroom closure … passes muster under *Waller's* first prong when an undercover officer articulates even a generalized fear that his safety could be endangered by testifying in open court and explains in rough terms the basis of his fear"); *Bobb v. Senkowski,* 196 F.3d 350, 354 (2d Cir.1999) (holding that where officer's testimony was not crucial to prosecution and family members did not seek to attend, "[i]t was sufficient for the state court to have before it testimony that the officer continued to work as an undercover officer …, that there were several 'lost subjects' still at large from his recent investigations, and that he feared for his safety if he were to testify in public.").

■■■■■ However, a heightened nexus between the officer's testimony and likelihood of prejudice to the officer's undercover status or safety must exist where, as here, the defendant has requested that his family members be permitted to remain. In *Vidal,* the primary Second Circuit case regarding the exclusion of a defendant's family members from a state court trial during an undercover officer's testimony, the officer testified that he was planning to return to the same neighborhood to conduct other undercover operations, that other undercover officers had been threatened, and that he feared for his safety should he testify in an open courtroom. The Second Circuit looked to two specific factors in deciding whether a sufficient nexus had been shown: (1) the likelihood that the family members would have encountered the officer during an undercover operation, and (2) whether there was any evidence that the family members "were inclined to harm a police officer." 31 F.3d

at 69. Finding that neither factor was met, the Court granted habeas despite the officer's legitimate but generalized concerns. *Id.; see also English*, 164 F.3d at 109 (rejecting prosecutor's "generalized comments" as insufficient to show overriding interest in closing courtroom to defendant's family during witness's testimony).

In *Woods*, in contrast, the Second Circuit affirmed the district court's denial of habeas relief for a defendant whose three family members had been excluded during one witness's testimony, in light of specific evidence that at least one of the excluded individuals had threatened the witness not to testify, and the witness was "scared to death." 977 F.2d at 76–77.

The facts of Yung's case are more similar to *Vidal* than *Woods*. As in *Vidal*, there was no evidence that Yung's family members lived on the Lower East side or were likely to encounter the officer during an undercover operation. In fact, no evidence was introduced regarding where Yung's mother, sister-in-law, and common-law wife lived. Moreover, as in *Vidal*, no evidence was introduced suggesting that any of Yung's family members "were inclined to harm a police officer." Although the officer in Yung may have had a more particularized reason to fear for his safety if his identity were revealed as a result of testifying than the officer in *Vidal*, because he had received threats in the past, the trial court did not require a sufficiently narrow nexus between the fear and the individual family members who were ejected from the trial.

This is not to say that an "actual threat" is necessary in order to justify closing the proceedings to a defendant's family members during an undercover's testimony, as the petitioner suggests. *See, e.g., Woods*, 977 F.2d at 77 (holding that closure is warranted for the protection of a witness

who is frightened as a result of "perceived threats" from defendant's family member). Such a standard would be nearly impossible to meet as an evidentiary matter, and is unnecessarily stringent.

 Rather, the appropriate standard should follow that employed by the *Vidal* court. In short, where, as here, a prosecutor neither demonstrates the likelihood that a defendant's family members will cross paths with an officer during an undercover operation, nor provides any articulable indication that family members "were inclined to harm a police officer," closure is not warranted. *See Vidal*, 31 F.3d at 69.

Therefore, Yung's Sixth Amendment right to a public trial was violated, and his petition for habeas corpus shall be granted.

### C. *Waller 3: Consideration of Alternatives*

 A trial court proposing to close the trial only during the testimony of a single witness need not *sua sponte* raise other alternative measures to effectuate the interests in closure. *See Bowden*, 237 F.3d at 131 ("Once he has ordered a narrow closure, a trial judge simply has *no* responsibility to assess other alternatives sua sponte.") (emphasis in original); *Ayala*, 131 F.3d at 64, 71 (same). As partial closure is itself an alternative to broad closure, and the parties did not raise alternatives such as raising a screen between the gallery and witness stand, the trial court satisfied *Waller's* third factor.

### D. *Waller 4: Adequate Findings to Support Closure*

Finally, although the Court did make specific findings after hearing testimony, more evidence was necessary regarding the family's likely interaction with the un-

dercover officer. As set forth above, the trial court should not have closed the proceedings to Yung's family members in order to protect the officer's identity and safety absent a showing that the family members were likely to cross paths with the officer during an undercover operation, or that they were inclined to harm him. No evidence was presented that was probative of these crucial questions. As such, the trial court's findings constituted an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

*Conclusion*

In sum, the trial court was not justified in ordering the courtroom to be closed to Yung's family during the undercover officer's testimony. The petition for habeas corpus is granted, and the case is hereby remanded with instructions to release Yung unless he is retried within a reasonable time. *See, e.g., Okonkwo,* 104 F.3d at 25 (holding that remanding to district court for release or retrial is preferable remedy to remand for new closure hearing).

It is so ordered.