**HOI MAN YUNG, Petitioner–Appellee,**

**v.**

**Hans WALKER and Eliot L. Spitzer, Respondents–Appellants.**

**Docket No. 03–2023–PR.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 18, 2003.

Decided: Oct. 31, 2006.

Melanie L. Oxhorn Esq., Attorney General State of New York, New York, NY, for Respondents–Appellants.

Before POOLER and SOTOMAYOR, Circuit Judges, and KAPLAN, District Judge.*

KAPLAN, District Judge.

Respondents Hans Walker and New York Attorney General Eliot L. Spitzer (collectively, the "State") appeal from a judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*) granting petitioner Hoi Man Yung a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The District Court concluded that (1) the state trial court's decision to close the courtroom to certain of Yung's relatives constituted an unreasonable application of Supreme Court precedent and (2) the State was not entitled to a *Nieblas* hearing. *See Nieblas v. Smith*, 204 F.3d 29, 32 (2d Cir.1999)

We agree with the District Court's conclusion that the state court did not make findings adequate to support the exclusion of each of Yung's three female relatives from the courtroom. We nonetheless part ways with the District Court in that we stop short of concluding that there was a constitutional violation. Instead, we hold that the District Court exceeded the permissible bounds of its discretion in granting the petition without affording the state courts an opportunity to make additional findings and to conduct an evidentiary hearing to permit the parties to present

* Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

additional evidence concerning the justification for the closure. We vacate and remand the judgment below so that the state court can do so.[1]

I

*The* Hinton *Hearing and the Trial*

We assume familiarity with the prior opinions in this case.[2] We briefly summarize only those points salient to this appeal.

In 1994, a New York state jury convicted Yung of two counts of criminal sale of a controlled substance in the first degree, nine counts of criminal sale of a firearm in the third degree, five counts of criminal possession of a weapon in the third degree, and three counts of criminal sale of a controlled substance in the third degree. Yung is serving a fifty-year to life sentence for these crimes.

An undercover police officer who testified for almost two of the four days of the trial was a key witness in the prosecution's case. Before the officer testified, the prosecution requested that the courtroom be sealed during his testimony. The trial court held a hearing pursuant to *People v. Hinton*, 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972).

During the *Hinton* hearing, the officer testified that he would fear for his safety if the courtroom were not closed during his testimony. In his nine years as an undercover officer, he had testified approximate-

ly forty times. In recent years, he said, he always had testified in a closed courtroom.

The officer testified that he had two pending investigations in the neighborhood in which Yung had operated. He testified that he had been threatened by individuals who knew Yung and Yung's brother, David, who had been arrested on similar charges. On cross examination, the officer conceded that the individuals who threatened him were not related to Yung. In addition, he said that the last threat occurred nine months prior to trial, was not connected to Yung's trial, and was made by a person who was on trial in an unrelated matter. The officer never had been threatened by a member of Yung's family.

When asked by defense counsel whether he had any "reason to fear" any member of Yung's family other than Yung's brother David, the officer responded that he could not answer the question but that he had fears concerning "[a]nyone who is involved in the current investigations, anyone who is affiliated with the individual who knows your client."

During the argument at the close of the hearing, defense counsel asked the court to exempt Yung's mother, Ha Chung Yuk; the mother of Yung's child, Beverly Soto; and Yung's sister-in-law, Theresa Soto, from any closure order. Defense counsel argued that "courts ... have said even if closure should be allowed it should be limited to what's necessary." Yung's three

---

1. In *Yung v. Walker*, 296 F.3d 129 (2d Cir. 2002) ("*Yung I*"), we vacated the District Court's prior grant of the writ, holding, among other things, that exclusion of family members from the courtroom requires the application of a "heightened showing." *Id.* at 136. After the District Court issued its decision on remand, we amended our decision, and no longer used the words "heightened showing." *See Yung v. Walker*, 341 F.3d 104 (2d Cir.2003) ("*Yung II*"). Although the changed language in *Yung II* does not affect the substance of the District Court's holding

that the state court unreasonably interpreted *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the timing of *Yung II* does mean that we will use different terminology than did the District Court when we assess this holding.

2. *Yung II*, 341 F.3d at 104; *Yung I*, 296 F.3d at 129; *Yung v. Walker*, 2002 WL 31778816 (S.D.N.Y. Dec.11, 2002); *Yung v. Walker*, 143 F.Supp.2d 262 (S.D.N.Y.2001).

female relatives, defense counsel reasoned, should not be excluded because they "have nothing to do with this case or any investigation whatsoever."

The prosecution objected, arguing that "[i]t is speculation to suggest that the defendant's family members will come in here and not report to the defendant's brother David Yung or to any of the other people with whom this defendant is associated who the undercover is, describe him and things of that nature." The prosecution emphasized that Yung and his brother had been affiliated with violent criminal organizations and that officers had found holsters and bullet proof vests in Yung's apartment.

The hearing court noted that the three women were connected at least to David Yung, who allegedly had participated in the same criminal activities as Yung and was not incarcerated. It then closed the courtroom to them as well as to the general public. The court found:

"I am closing the courtroom because this is an undercover police officer who is currently working in an undercover capacity. He is working in the same general area in his undercover capacity, namely the Lower East Side. He has open and pending cases with unapprehended suspects. He has been threatened in the past, I find that, by people connected with the defendant. To allow family members into the courtroom can jeopardize the safety, the life safety and security of this officer by making it easier for those who the defendant is associated with on the outside to identify him, thereby placing him in great risk for his life."

Yung later testified at his trial. He admitted his involvement in the sales of drugs and guns for which he was charged, but insisted that he was entrapped into doing so. Yung conceded, however, that he had lived a life of crime between 1986 and 1990. During that time, he intermittently was involved in dealing drugs and guns. He testified that he had been arrested in May 1990 in connection with those activities, convicted of a federal drug felony in 1991, and released in May 1991. He testified also that police raided the apartment he lived in numerous times in 1990, that during at least one such raid the police had found bullet proof vests and holsters, and that his brother David had kept guns in the apartment.

But, according to Yung, his life turned a corner following his release from prison. He testified that he worked legitimate jobs, first as a bus boy from September 1991 through June 1992, and then as a construction worker from June 1992 through July or August 1992. He stated that immediately following his release from prison he participated in a drug treatment program that included counseling, drug testing, and weekly meetings. He testified that he successfully completed the program in April 1992.

Following his release from prison in 1991, Yung lived with his parents and his brother David in the same apartment he had lived in prior to his arrest, and he continued to live there up until his arrest in this case. His girlfriend, Beverly Soto, and their child, born in March 1992, also lived in the apartment for at least part of that time, although the record does not indicate exactly when.

According to Yung, his crime-free life stopped in June 1992. He testified that he sold drugs and guns between June 1992 through August 1992, but insisted that he did so only because a police informant threatened to have his parole violated if he did not participate.

Yung testified that he gave approximately $3,000 of crime proceeds to his family.

The record does not reflect which family members received the money or whether they knew that the funds were obtained illegally.

Although the record is not entirely clear on this point, it may be the case that Yung did not keep contraband in the apartment in 1992 because police had raided it in 1990. There is also some indication that Yung may have avoided using the phone in his apartment to conduct his illegal activities, as he knew the police had tapped it in 1990.

*Subsequent History*

Yung appealed his conviction to the Appellate Division, First Department, arguing mainly that the State's exclusion of his family from the courtroom violated his right to a public trial under the Sixth Amendment and under New York law. The Appellate Division nonetheless affirmed, finding that the state court properly had closed the courtroom "based on the officer's testimony ... establishing particularized reasons for concern that defendant's relatives posed a threat to his safety by revealing his identity." *People v. Yung,* 240 A.D.2d 252, 253, 659 N.Y.S.2d 733, 733 (1st Dep't 1997). The New York Court of Appeals denied leave to appeal. *See People v. Hoi Man Yung,* 90 N.Y.2d 940, 664 N.Y.S.2d 758, 687 N.E.2d 655 (1997).

On February 18, 2000, after having exhausted his state remedies, Yung filed the petition that is the subject of this appeal. He claimed that the closure of the courtroom to his family members violated his Sixth Amendment right to a public trial.

The District Court examined the record of the *Hinton* hearing to determine if the closure complied with *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), which allows a court to close a courtroom only if:

"the party seeking to close the hearing ... advance[s] an overriding interest that is likely to be prejudiced, the closure ... [is] no broader than necessary to protect that interest, the trial court ... consider[s] reasonable alternatives to closing the proceeding, and [i]t ... make[s] findings adequate to support the closure."

*Waller,* 467 U.S. at 48, 104 S.Ct. 2210. The judge below determined that the closure did not satisfy the second prong of *Waller* because it was overly broad with respect to Yung's three female relatives. *Yung,* 143 F.Supp.2d at 272. In doing so, he cited our decision in *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994), which held that an order excluding family members was not appropriate where the prosecutor failed to show that the excluded family members likely would encounter the undercover officer during his operations or that they would be inclined to harm the officer. *Yung,* 143 F.Supp.2d at 271. The District Court found that the prosecution had shown neither. *Id.* at 272. It held, moreover, that the state court had not satisfied the fourth prong of *Waller* in that it did not make findings sufficient to justify the closure. *Id.* at 272–73. It therefore granted the writ and remanded the case to the state court "with instructions to release Yung unless he is retried within a reasonable time." *Id.* at 273.

The State appealed, arguing that the District Court had erred by failing to (1) presume the correctness of the state court's finding that Yung's family members posed a danger to the undercover officer, and (2) conduct an evidentiary hearing pursuant to *Nieblas v. Smith,* 204 F.3d 29 (2d Cir.1999). In *Yung I,* we vacated the judgment because the District Court had relied upon *Vidal* instead of Supreme Court precedent in determining that the courtroom closure was improper. 296 F.3d at 136. We explained that "the

precise showing ... outlined in *Vidal*" was not necessarily mandated by clearly established Supreme Court precedent. *Id.* We could not "determine with confidence whether the district court would have reached the same result if it had applied the more general teachings of *Waller* and *In re Oliver*[, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948),] rather than the specific language of *Vidal.*" *Id.*

After concluding that the precise showing in *Vidal* was not necessarily mandated by clearly established Supreme Court law, we nevertheless held that Supreme Court precedent requires a heightened showing to justify exclusion of family members. We wrote:

"Although the portion of *In re Oliver* that specifically refers to family members is dicta, we believe that *Waller's* second mandate—that the closure be no broader than required to protect the overriding interest at stake—envisions an examination not just of the length of the closure but also of the portion of the public to be excluded. In light of *In re Oliver*, ... it would be an unreasonable interpretation of *Waller* or, at a minimum, an unreasonable failure to extend *Waller*, not to require a heightened showing before excluding family members."

*Id.*

We held also that the District Court did not abuse its discretion in failing to hold a *Nieblas* hearing, as the State had not requested one. *Id.* at 137. We suggested, however, that the District Court might find it "advisable to conduct a supplementary hearing or to remand to the state trial court for such a hearing." *Id.*

We therefore remanded to the District Court to reassess the reasonableness of the courtroom closure under Supreme Court precedent and, in its discretion, to conduct a *Nieblas* hearing or to remand to the state court for a further *Hinton* hearing. *Id.* at 138.

On remand, the District Court again granted the writ. *Yung*, 2002 WL 31778816, at *9. It determined that only the fourth *Waller* prong—whether the court's findings were adequate to support the closure—is at issue in this case. *Id.* at *6. It then applied the heightened standard set forth in our original opinion. *Id.* at *7. The District Court concluded:

"[T]he question before this Court is whether the presumptively correct factual finding that the presence of family members would make it easier for others to identify the undercover is sufficient to justify closing the courtroom to the three female relatives. While this justification is sufficient to justify closure to the public at large, it does not meet the heightened showing for family members as required by *In re Oliver* and *Waller*."

*Id.* at *6.

The District Court again declined to hold a *Nieblas* hearing. *Id.* at *8. It rejected the State's contention that a change in the case law had occurred between the state trial court's ruling and the filing of the habeas petition such that the state court's failure to conduct a more extensive *Hinton* hearing was excusable. *Id.* The court explained: "If a state adjudication is contrary to 'clearly established Federal law, as determined by the Supreme Court,' it cannot also be said that a change of law has occurred between the adjudication and the filing of the petition such that the state court would have behaved differently." *Id.* (quoting 28 U.S.C. § 2254(d)(1)). In any event, the court concluded, *People v. Nieves*, 90 N.Y.2d 426, 660 N.Y.S.2d 858, 683 N.E.2d 764 (1997), the intervening case relied upon by the State as having changed the governing law, had not "so

drastically changed or even 'clarified' the law of closure," since, at the time of the state court's adjudication, it was already the law that "the closure of courtrooms to family members required heightened scrutiny." *Yung*, 2002 WL 31778816, at *8.

Yung I *Is Amended*

Shortly after the District Court issued *Yung I*, a different panel of this Court decided *Sevencan v. Herbert*, 316 F.3d 76 (2d Cir.2002) ("*Sevencan I* "), holding that the heightened showing requirement of *Yung I* is satisfied "where the record reflects that the state trial court considered the familial relationship at the time the family member was excluded." *Id.* at 87–88. It held also that *Yung I* did not place "an additional burden on the prosecution whenever a family member is excluded" because to do so would "alter the [*Waller*] standard" in violation of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Id.* at 86 (emphasis in original).

Turning to the facts of the case before it, the *Sevencan* panel held that the state court decision to exclude the defendant's wife from the courtroom during the testimony of an undercover officer was not an unreasonable application of Supreme Court law because the state court was "aware of the familial relationship" between the defendant and his wife before making its decision. *Id.* at 87.

The panel decision in *Sevencan I* was in some tension with this panel's decision in *Yung I*. Subsequently, both panels filed amended opinions. *See Yung II*, 341 F.3d at 106; *Sevencan v. Herbert*, 342 F.3d 69 (2d Cir.2003) ("*Sevencan II* "). In each instance, only the analysis, not the dispositions, changed. *See Yung II*, 341 F.3d at 106; *compare Sevencan I*, 316 F.3d at 84–87 *with Sevencan II*, 342 F.3d at 76–78.

In *Yung II*, we described the standard for excluding family members from a courtroom during a criminal trial without characterizing it as a "heightened standard." We said:

> "*Waller's* second mandate—that the closure be no broader than required to protect the overriding interest at stake—necessarily applies to both the duration of the closure and to the portion of the public to be excluded. Thus, *Waller* prevents a court from denying a family member's request to be exempted from a courtroom closure order unless the court is convinced that the exclusion of that particular relative is necessary to protect the overriding interest at stake. Indeed, it would be an unreasonable interpretation of *Waller* for a court to deny such a request if the exclusion of that particular relative, under the specific circumstances at issue, is not necessary to promote the overriding interest."

341 F.3d at 110–11.

The amended *Sevencan* opinion applied this holding to the facts of that case. *Sevencan II*, 342 F.3d at 76–77. It considered more than the state court's awareness of the familial relationship in determining whether the closure was necessary to protect the overriding interest. It noted, for example, that the defendant and his associates were highly dangerous, that the undercover officer conducted operations in the neighborhood where defendant's wife lived, that the defendant's wife was a "timid[,] pliable" woman likely to be susceptible to requests from her husband's associates, and that the defendant's wife was knowledgeable about her husband's illegal activities. *Id.* at 77 (alteration in original).

As we noted, the District Court did not have the benefit of *Yung II* and *Sevencan II*.

## II

The State now argues that the District Court erred in (1) holding that the state

trial court's decision to exclude Yung's three female relatives was an unreasonable application of Supreme Court precedent, and (2) denying the State's request to conduct a *Nieblas* hearing.

*Standard of Review*

■ We review *de novo* a district court's decision to grant a writ of habeas corpus. *E.g., Wade v. Mantello,* 333 F.3d 51, 56 (2d Cir.2003).

Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We must presume the state court's factual findings to be correct and may overturn those findings only if the petitioner offers "clear and convincing evidence" of their incorrectness. 28 U.S.C. § 2254(e)(1).

A decision is "contrary to" clearly established federal law if it contradicts a decision by the Supreme Court or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■ A decision involves an "unreasonable application" of clearly established federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 407–08, 120 S.Ct. 1495, or refuses to extend a legal principle that the Supreme Court has clearly estab-

lished to a new situation in which it should govern, *Kennaugh v. Miller,* 289 F.3d 36, 45 & n. 2 (2d Cir.2002). A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 411, 120 S.Ct. 1495. Rather, that application must also be unreasonable. *Id.* "[T]he increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

*The Closure*

■ Yung argues that the exclusion of his three female relatives from the courtroom violated his constitutional right to a public trial. On remand, the District Court relied upon the heightened standard in *Yung I* to determine whether the closure was an unreasonable application of clearly established law. Because our amended opinion does not mention a heightened standard, the District Court's analysis, through no error on its part, must be modified. Nevertheless, applying the correct legal standard, we reach the same conclusion as the District Court insofar as we hold that the state trial court did not make findings adequate to justify excluding Yung's three female relatives from the courtroom. We further conclude, however, that it was premature for the District Court to determine that the closure violated the petitioner's public trial guarantee in the absence of more detailed findings and an evidentiary hearing.

The state trial court found that closing the courtroom to Yung's family members was justified because allowing them into the courtroom would "make it easier" for

those associated with Yung to identify the officer. As we held in *Yung II,* however, "it would be an unreasonable interpretation of *Waller* for a court to deny ... a request [to permit a family member into a courtroom] if the exclusion of that particular relative, under the specific circumstances at issue, is not necessary to promote the overriding interest." 341 F.3d at 111. The state court's generalized finding, that allowing family members into the courtroom would "make it easier" for persons associated with the petitioner to identify the officer, which we presume to be correct, is not equivalent to the findings in *Sevencan II* or to a reasoned explanation of why the exclusion of each particular relative is necessary to protect the officer. Accordingly, we agree that the state court did not make findings adequate to show that excluding Yung's three female relatives from the courtroom was necessary to protect the overriding interest in the officer's safety.

### III

■ Our inquiry does not end here. Although we agree with the District Court that the state trial court did not make findings adequate to support the closure, we stop short of reaching the District Court's conclusion that Yung's constitutional right to a public trial was violated. It is premature to determine if the closure was justified without giving the state court an opportunity to supplement its findings and conduct an evidentiary hearing.

■ The decision whether to hear further evidence at the request of the state in a habeas case is committed to the discretion of the District Court. *Nieblas,* 204 F.3d at 31–32.[3] The question before us is whether the District Court exceeded the bounds of its discretion by granting the petition in the absence of an evidentiary hearing. *See Id.* We conclude that it did.

To begin with, the Supreme Court has held that a new trial is not required to remedy a violation of the public trial guarantee if some other relief would cure the violation. *Waller,* 467 U.S. at 49–50, 104 S.Ct. 2210. In *Waller,* the Supreme Court held, on direct review, that the closure of a seven-day suppression hearing by a Georgia state court violated the defendants' public trial guarantee. *Id.* at 48–49, 104 S.Ct. 2210. However, the violation did not require a new trial. *Id.* at 50, 104 S.Ct. 2210. The court explained: "[T]he remedy should be appropriate to the violation. If, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." *Id.* The defendants would be entitled to a new trial "only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties." *Id.* To avoid the windfall effect of a new trial when it is not clear that the petitioner has been unconstitutionally denied a public trial, we have, in appropriate circumstances, directed or approved reconstruction hearings. *See, e.g., Nieblas,* 204 F.3d at 32.

These considerations require at least that the state court be given the opportunity, based on the existing record, to expand upon its findings. Federal habeas corpus for state prisoners is a vital guarantor of constitutional rights. But it should not be administered in a manner that needlessly trespasses on the states' impor-

---

3. Although the Supreme Court and Congress in recent years have limited the circumstances in which a habeas court is required or even permitted to hold an evidentiary hearing at the request of a petitioner, "where the district court chooses to hear additional evidence on behalf of the state ..., its discretion remains broad." *Nieblas,* 204 F.3d at 31–32.

tant interest in the conclusiveness of their own judgments. To make the finality of a state criminal conviction turn upon an interpretation of ambiguous statements by a state court trial judge where the trial judge's intentions are unclear, and any uncertainty may be removed simply by affording the judge an opportunity to elaborate, would do precisely that. In this case, however, more is required. So we must consider whether the district court properly rejected the State's request for an evidentiary hearing.

■ In *Nieblas,* we recognized that a district court has discretion to grant an evidentiary hearing at the request of the state. We identified three situations in which such a hearing would be appropriate: (1) "where the defendant may have sandbagged the state or otherwise engaged in strategic manipulation during the state-court proceeding," and (2) "where the state's failure to present adequate evidence below is excusable—for example, due to a change in the governing law," and (3) "where either of the above two reasons [sandbagging or an intervening legal development] or any other similar reason exists, it is particularly appropriate for a habeas court to gather additional evidence—rather than granting the defendant the 'windfall' of a new trial-where the alleged constitutional violation does not affect the fairness of the outcome at trial." *Nieblas,* 204 F.3d at 32.

This appeal presents two factors similar to those described in *Nieblas.* First, although the prosecutor certainly had an opportunity to address the propriety of excluding Yung's three female relations, he had no reason to believe that Yung's sister-in-law should have been treated differently than the other two relatives because she may not have lived with Yung, which is at least arguable on this record. Second, after Yung's trial, the New York Court of

Appeals decided *People v. Nieves,* 90 N.Y.2d 426, 660 N.Y.S.2d 858, 683 N.E.2d 764 (1997), in which it held that the prosecutor must demonstrate "a 'substantial probability' that the officer's safety would be jeopardized by [their] presence" to exclude a defendant's closest relatives. *Id.* at 431, 660 N.Y.S.2d at 861, 683 N.E.2d 764. In *Sevencan II,* we held that the district court correctly held a *Nieblas* hearing because "it is likely that the State would have built a stronger case for the exclusion" of a family member if "the rule of *Nieves* [had] been New York law at the time of trial." 342 F.3d at 77. We conclude here that the District Court should have directed a hearing based on the presence of factors similar to two of the *Nieblas* factors, especially since the courtroom closure had no direct impact on the fairness of Yung's trial.

The final question is whether the District Court or the state trial court should conduct the evidentiary hearing, bearing in mind that considerations of comity weigh heavily in favor of the state forum. *Cf. Jackson v. Denno,* 378 U.S. 368, 393, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (where a habeas petitioner had been denied his right to a fair hearing on the voluntariness of a confession, the state—not a federal habeas corpus court—was entitled to the first opportunity to provide an adequate evidentiary hearing to determine whether the confession was voluntary). In this case, we have concluded that the state court is the appropriate forum.

We are mindful that there may be situations in which the violation of a particular defendant's public trial guarantee is so egregious that justice automatically requires a new trial. This is not such a case. The state court limited the closure to one witness's testimony, and it did so only after holding a hearing to consider the appropriateness of the closure. Nor is this

a situation in which there is a practice of abusing federal rights that is so widespread that a new trial is needed in order to deter future violations. We have observed previously that "New York does not evince any kind of hostility to a defendant's right to a public trial." *Brown v. Kuhlmann,* 142 F.3d 529, 543 (2d Cir. 1998). "On the contrary, New York law guarantees a defendant a public trial, and the New York appellate courts have been particularly vigilant in correcting errors involving partial courtroom closures." *Id.* (internal citations omitted).

## IV

Accordingly, we vacate the judgment appealed from and remand to the District Court to allow the State a reasonable time either to (1) grant petitioner a new trial or (2) hold an evidentiary hearing and, in any case, to make findings justifying the exclusion of Ha Chung Yuk, Beverly Soto, and Theresa Soto, failing which Yung is entitled to his release.