Vernon BOWDEN, Petitioner–
Appellant,

v.

John KEANE, Superintendent, Woodbourne Correctional Facility, and Eliot Spitzer, Attorney General of New York, Respondents–Appellees.

No. 00–2126.

United States Court of Appeals,
Second Circuit.

Argued: Sept. 12, 2000.

Decided: Jan. 05, 2001.

---

Judith Preble, The Legal Aid Society, New York, NY, for Petitioner–Appellant.

Melanie L. Oxhorn, Assistant Solicitor General of the State of New York (Eliot Spitzer, Attorney General of the State of New York, Preeta D. Bansal, Solicitor General of the State of New York, Edward D. Johnson, Deputy Solicitor General, of counsel), for Respondents–Appellees.

Before FEINBERG, CABRANES, and PARKER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

We review a judgment of the United States District Court for the Southern District of New York (John E. Sprizzo, *Judge*) denying appellant Vernon Bowden's petition for a writ of habeas corpus on the ground that closure of the courtroom during Bowden's trial did not violate his rights under the Sixth Amendment to the United States Constitution. Under the framework established in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), a criminal trial may be closed to the public only if "[1] the party seeking to close the hearing ... advance[s] an overriding interest that is likely to be prejudiced, [2] the closure ... [is] no broader than necessary to protect that interest, [3] the trial court ... consider[s] reasonable alternatives to closing the proceeding, and [4] [the trial court] make[s] findings adequate to support the closure." *Id.* at 48, 104 S.Ct. 2210. We hold that each of these four prongs was satisfied here, and that the courtroom closure ordered by the trial judge was therefore constitutionally permissible. Accordingly, we affirm the judgment of the District Court.

## I.

The District Court summarized the facts that give rise to this appeal:

> Petitioner [Bowden]'s conviction arose out of a "buy and bust" transaction in which he sold three vials of crack cocaine to Detective Billingy ("Billingy"), an undercover police officer. According to Billingy's testimony, which he gave in open court, Billingy observed petitioner on July 2, 1993 outside of a building near 126th Street in Manhattan. As Billingy approached the building, petitioner "hissed" at him and gestured for him to wait. Billingy testified further that petitioner then led him into the

building and asked what he wanted. Billingy told petitioner that he wanted "three" and gave petitioner twelve dollars in pre-recorded buy money. Billingy then testified that petitioner walked up several steps, lifted a doormat, and removed three vials of crack cocaine from a bag under the mat. He then descended the stairs and gave the vials to Billingy.

Detective Weathers ("Weathers"), another undercover officer, subsequently testified in *closed* court that he followed Billingy from a half-block behind during the operation, acting as his "ghost ." He testified further that from a distance of approximately 100 to 150 feet, he observed petitioner leave and enter the building with Billingy, and that thereafter, he transmitted a detailed description of petitioner to the arrest team. He subsequently joined Billingy in an undercover car, where, according to both Billingy and Weathers' testimony, they radioed in a description of petitioner and did a drive-by identification while petitioner was detained. . . .

On January 13, 1994, the trial court [Supreme Court, New York County] held a . . . hearing on the government's motion to close the courtroom during Detective Weathers' testimony. During the hearing, Weathers testified that he was assigned to the North Manhattan Narcotics District, where he was participating in several ongoing narcotics investigations. He also indicated that he had been threatened by drug dealers who suspected that he was a police officer, stating: "I've already been threatened by alleged drug dealers for being a cop. I'm supposed to be killed or whatnot [sic], mutilated, strangulated [sic]." Moreover, Weathers testified that he had approximately twenty-five to thirty "lost subjects," or suspects from whom he had bought drugs but who[] had not been arrested. Defense counsel briefly cross-examined Weathers, and after summation by the prosecution, objected to the closure and rested on the record.

The trial judge granted the prosecution's motion to close the courtroom, stating: "I believe the record now does substantiate closure of the courtroom, and I am not going to summarize it. I think it speaks for itself, not the least factor of which is the way information circulates throughout this system[.] [It] is perfectly conceivable to me that word will get out if I did not close the courtroom that an undercover officer would be testifying and that he will be identified, and it isn't necessary for people to be sitting in the courtroom."

*Bowden v. Keane,* 85 F.Supp.2d 246, 248–49 (S.D.N.Y.2000) (footnotes and internal citations omitted).

Weathers then testified behind closed doors with the jury present, the jury returned a verdict convicting Bowden of criminal sale of a controlled substance in violation of New York Penal Law § 220.39[1], and the trial judge sentenced Bowden to a prison term of 9–18 years. On direct appeal, Bowden's conviction was affirmed, *see People v. Bowden,* 234 A.D.2d 127, 651 N.Y.S.2d 453 (1st Dep't 1996), and leave to appeal was denied, *see People v. Bowden,* 90 N.Y.2d 891, 662 N.Y.S.2d 434, 685 N.E.2d 215 (1997).

Bowden, who is still incarcerated pursuant to the sentence imposed on him by the state trial judge, then filed a petition in the District Court for a writ of habeas corpus under 28 U.S.C. § 2254. Bowden claimed, as he does now, that his Sixth Amendment right to a public trial was violated by the closure of the courtroom during Weathers's testimony. The District Court denied the petition, entered judgment accordingly, and granted Bowden a certificate of appealability. This timely appeal followed.

## II.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant a "public" trial. U.S. CONST. amend. VI; *see also Duncan v.*

*Louisiana,* 391 U.S. 145, 148 & n. 10, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (holding that the Sixth Amendment right to a public criminal trial applies to the states by virtue of the Fourteenth Amendment). In conjunction with the First Amendment, the Sixth Amendment public trial guarantee confers on criminal defendants the right to be tried in a courtroom whose doors are open to any members of the public inclined to observe the trial. *See Ayala v. Speckard,* 131 F.3d 62, 69 (2d Cir.1997) (*en banc*) (noting that "[t]he explicit Sixth Amendment right of the accused is complemented by an implicit, 'qualified' First Amendment right of the ... public of access to a criminal trial."); *see generally Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (describing the "presumption of [courtroom] openness").

■ However, this right to be tried in open court is not absolute. *See United States v. Doe,* 63 F.3d 121, 126–27 (2d Cir.1995). It is not trammeled, for example, by a trivial, inadvertent courtroom closure, *see Peterson v. Williams,* 85 F.3d 39 (2d Cir.1996), and in certain circumstances a court may order its doors closed for a non-trivial period—and over a defendant's objection—without violating the Constitution. As noted above, as to intentional, non-trivial courtroom closures, the Supreme Court held in *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), that a criminal trial may be closed to the public only if "[1] the party seeking to close the hearing ... advance[s] an overriding interest that is likely to be prejudiced, [2] the closure ... [is] no broader than necessary to protect that interest, [3] the trial court ... consider[s] reasonable alternatives to closing the proceeding, and [4] [the trial court] ... make[s] findings adequate to support the closure." *Waller,* 467 U.S. at 48, 104 S.Ct. 2210. In this case, Bowden argues that the District Court erred in its analysis of each of the four prongs of the *Waller* test.

**A.**

■ Under the first prong of the *Waller* test, we have held that a trial judge confronted with a request for a courtroom closure should "require persuasive evidence of serious risk to an important interest in ordering any closure, and ... realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Ayala,* 131 F.3d at 70. In other words, criminal trials may not be closed unless the "serious risk to an important interest" threshold has been crossed; once this threshold has been crossed, a courtroom closure is permissible so long as there is a positive and proportional relationship between (1) the extent of the closure, and (2) the "gravity" of the interest that assertedly justifies the closure, discounted by the probability of the interest being harmed if the courtroom is not closed. *See Brown v. Kuhlmann,* 142 F.3d 529, 538 (2d Cir.1998) (describing *Ayala* as requiring a "positive correlation" between a closure's scope and the risk to the interest that justifies the closure). Accordingly, if a party seeks a broad closure, it must demonstrate that the interest that the closure would purportedly serve is especially grave, and that the risk that would be posed to that interest by not closing the courtroom is more than "serious." *Ayala,* 131 F.3d at 70. Conversely, if a party seeks a relatively narrow courtroom closing, the burden it must carry is not a "heavy" one. *Brown,* 142 F.3d at 538.

■ Whether a closure is deemed broad or narrow depends on a number of factors, including its duration, *see English v. Artuz,* 164 F.3d 105, 108 (2d Cir.1998); *Brown,* 142 F.3d at 538; *Ayala,* 131 F.3d at 72; whether the public can learn (through transcripts, for example) what transpired while the trial was closed, *see Ayala,* 131 F.3d at 72; *Herring v. Meachum,* 11 F.3d 374, 379–80 (2d Cir.1993); whether the evidence presented during the courtroom closure was essential, or whether it was merely cumulative or ancillary,

**130**

*see Brown*, 142 F.3d at 538; and whether selected members of the public were barred from the courtroom, or whether all spectators were precluded from observing the proceedings,[1] *see Guzman v. Scully*, 80 F.3d 772, 775 (2d Cir.1996); *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir.1992).

■ In this case, the closure ordered by the trial judge was a narrow one. First, the court was closed only during the testimony of one witness—Detective Weathers. Second, a transcript of Weathers's testimony was available to the public. Finally, as explained by the District Court, Weathers's testimony was by no means essential to the government's case against Bowden:

> Detective Billingy testified in *open* court to all the essential details of the crime at issue. These details included that he asked [Bowden] for drugs, that he accompanied [Bowden] inside a building, and that [Bowden] took his money in exchange for drugs placed under a doormat.
>
> Detective Weathers, on the other hand, testified simply that he saw Billingy meet with [Bowden] outside the building and leave with him and that Billingy *later informed him* that it was [Bowden] who had in fact ... sold him the drugs. .... Detective Weathers was in no way a party to the [Billingy Bowden] transaction, and in no way provided the only direct testimony "as to the defendant's identity as the seller."

*Bowden*, 85 F.Supp.2d at 250–51 (quoting *Brown*, 142 F.3d at 534).

A narrow courtroom closure such as this one passes muster under *Waller*'s first prong when an undercover officer articulates even a generalized fear that his safety could be endangered by testifying in open court, and explains in rough terms

the basis of his fear. *See Bobb v. Senkowski*, 196 F.3d 350, 354 (2d Cir.1999); *Brown*, 142 F.3d at 537–38. Here, Detective Weathers testified that he believed that his life could be endangered if he were required to take the stand in open court because (1) he was involved in ongoing undercover operations involving illegal narcotics; (2) several suspects targeted in those operations had not yet been apprehended; and (3) a number of drug dealers had threatened to kill him if they discovered that he was a police officer. This testimony plainly satisfied the first prong of the *Waller* test. *See Bobb*, 196 F.3d at 354 (upholding a narrow courtroom closure on the ground that "[i]t was sufficient for the state court to have before it testimony that the officer continued to work as an undercover officer ..., that there were several 'lost subjects' still at large from his recent investigations, and that he feared for his safety if he were to testify in public").

**B.**

■ Under the second prong of the *Waller* test, a closure must be "no broader than necessary" to vindicate the interest that justifies it. *Waller*, 467 U.S. at 48, 104 S.Ct. 2210. Our adoption in *Ayala* of a sliding scale approach to the first *Waller* factor means that there will not always be a meaningful analytic distinction between the first and second prongs of the *Waller* test.[2] *See, e.g., Guzman*, 80 F.3d at 776.

That is the case here. Bowden argues that "[a]bsent a showing sufficient to justify closure under Prong 1, the closure of the courtroom was necessarily 'broader than necessary' and violated Prong 2." Petitioner–Appellant's Brief at 35. However, because we have held that "Prong 1" was fully satisfied, *see ante* at II.A., Bowden's

---

1. Special concerns may apply when the spectators selectively barred from the courtroom are the defendant's family members. *See Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir.1994) ("[T]he Supreme Court has specifically noted a special concern for assuring the attendance [at trial] of family members of the accused.").

2. Indeed, in many cases there will be an appropriately proportional relationship between the scope of a closure and the risk that justifies the closure *precisely because* the closure is as narrowly tailored as reasonably possible.

argument as to "Prong 2" is, on its own terms, unavailing.

### C.

■ As to the third *Waller* factor, we held in *Ayala* that "once a trial judge has determined that limited closure is warranted as an alternative to complete closure, the judge ... [need not] *sua sponte* consider further alternatives." *Ayala*, 131 F.3d at 71. Nonetheless, Bowden argues that the trial judge in *this* case was required to consider further alternatives *sua sponte* because it was in his oral ruling that the trial judge first suggested that closure was warranted, in part, because of the possibility that spectators in the hallway outside the courtroom might learn that an undercover officer was testifying inside the courtroom. Accordingly, Bowden contends that his trial lawyer "cannot be faulted for not proposing the remedy"—keeping the courtroom doors open, but allowing Detective Weathers to enter through a side door, unbeknownst to hallway spectators—"that had *suddenly* ... become relevant." Petitioner Appellant's Brief at 36 (emphasis added). Thus, Bowden concludes, "the [trial] court's failure to consider an alternative to closure that would directly address the danger it perceived should be recognized as a violation of the court's obligation to consider reasonable alternatives under *Waller*." *Id.*

■ We are not persuaded. The factual premise of Bowden's argument is that his trial counsel did not have an adequate opportunity to propose the "side ˇdoor" remedy. However, the record suggests nothing of the kind. There is no indication that Bowden's trial attorney attempted to speak, but was precluded—or even discouraged—from doing so. Rather, the record reflects that the trial judge issued his ruling and granted Bowden an excep-

tion, and that Bowden's counsel then responded "Thank you, Judge." The window of opportunity during which Bowden's counsel could have responded to the trial judge's ruling may well have been small, but it was adequate.

■ The legal premise of Bowden's argument is also flawed. Once he has ordered a narrow closure, a trial judge simply has *no* responsibility to assess other alternatives *sua sponte*. *See Ayala*, 131 F.3d at 72.[3] We refuse to infer an exception to this rule for cases in which a defendant's trial lawyer was not at fault in failing to propose alternatives to closure because the basis for the rule has nothing to do with *fault*. *See id.* at 71–72 (explaining that *sua sponte* consideration of further alternatives is not required because (1) there is no authority for such a requirement in the Supreme Court's jurisprudence and (2) imposing such a requirement would be "dangerous"). *See generally Pearson v. James*, 105 F.3d 828, 832 (2d Cir.1997) (Jacobs & Cabranes, JJ. concurring) (describing practical difficulties with requiring *sua sponte* consideration of alternatives). Accordingly, even assuming *arguendo* that Bowden's trial counsel cannot be faulted for failing to propose a particular alternative to closure, the trial judge was under no obligation to consider the alternative *sua sponte*.

### D.

■ Under the fourth prong of the *Waller* test, the factual record must "adequate[ly]" support the *particular* courtroom closing ordered by the trial judge. *Waller*, 467 U.S. at 48, 104 S.Ct. 2210. The quality and extent of the evidence that will support a closure therefore will vary from case to case, depending on the scope of the closure. *See Brown*, 142 F.3d at 538 (explaining that "the strength of the

---

**3.** Although some pre-*Ayala* dicta may suggest a contrary rule, *see In re Herald Co.*, 734 F.2d 93, 100 (2d Cir.1984), *Jones v. Henderson*, 683 F.Supp. 917, 923–24 (E.D.N.Y.1988), those seeds have fallen upon stone, and the law in

this Circuit is plain: upon ordering a limited closure, a trial judge need consider further alternatives *only* upon a party's request. *See Ayala*, 131 F.3d at 72.

judge's findings must be evaluated by reference to the ... scope of the closure that they support"). In accord with this principle, we have held, for example, that a trial judge's findings adequately buttressed a "very limited" closure even though they were "neither entirely accurate nor particularly compelling." *Id.*

Here, Bowden argues that the fourth prong of the *Waller* test was not satisfied because the state trial judge did not make sufficiently specific factual findings. Rather, Bowden notes, the judge simply took testimony from Detective Weathers, heard oral argument, and then determined that the record "substantiate[s] closure" and "speaks for itself." *See ante* at 128.

We have no difficulty, however, gleaning competent evidence from the record—all of which is uncontroverted—that justified the closure in this case. *See ante* at II.A. And we have held that such appellate "glean[ings]" can satisfy *Waller*'s fourth prong—at least when the closure at issue is a narrow one, as it was here. *See Woods,* 977 F.2d at 77–78 (in the case of a "partial, temporary closure," *Waller*'s fourth prong is satisfied when "information" that supports the closure can be "gleaned" by the Court of Appeals from the record developed by the trial court); [4] *accord United States v. Farmer,* 32 F.3d

369, 371 (8th Cir .1994) (holding that "specific findings by the district court are not necessary if we can glean sufficient support for a partial temporary closure from the record").

\* \* \*

We have considered Bowden's remaining arguments, and conclude that they are without merit. To summarize, we hold that the narrow courtroom closure ordered in this case by the trial judge satisfied the four-prong test articulated by the Supreme Court in *Waller v. Georgia.* In particular, we hold that:

(1) the first prong of the *Waller* test—that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," *see Waller,* 467 U.S. at 48, 104 S.Ct. 2210—was satisfied because the undercover officer who testified while the courtroom was closed offered cumulative testimony, a transcript of his testimony was publicly available, he articulated a generalized fear that his safety could be endangered by testifying in open court, and he explained in rough terms the basis of his fear;

(2) Bowden's argument that because the *first* prong of the *Waller* test was not satisfied the closure did not pass muster under the *second* prong of the test—

---

4. Bowden suggests that there is some tension between *Woods*'s approval of "glean[ing]" and our decisions in two subsequent cases, *Guzman v. Scully* and *English v. Artuz,* in which we concluded that the fourth prong of the *Waller* test was not satisfied because the trial court made "conclusory" findings, *Guzman,* 80 F.3d at 776, and overly "[b]road and general" findings, *English* 164 F.3d at 109. We disagree. First, both *Guzman* and *English* concerned closures specifically directed at the defendant's family members, and in both cases we noted that such closures implicate special constitutional concerns. *See English,* 164 F.3d at 108; *Guzman,* 80 F.3d at 776; *see also ante* at n. 1. In this case, the closure ordered by the trial judge was general. It was not directed at Bowden's family members—indeed, Bowden's mother was exempted from the trial judge's closure order, and was permitted to observe the proceedings

while Detective Weathers testified. Second, in both *Guzman* and *English* the trial court's decision to order a closure was not based on *any* competent record evidence. In *Guzman,* the trial judge ordered the courtroom closed based on "the *unsubstantiated* statements of the prosecutor," and did not "conduct[ ] an inquiry of the prosecution witness on whose behalf the closure request was made." *Guzman,* 80 F.3d at 775 (emphasis added). Similarly, in *English,* the trial court ordered a courtroom closing even though the only competent evidence in the record—an undercover officer's testimony—suggested that the courtroom should *not* be closed. *See English,* 164 F.3d at 110. In this case, as in *Woods,* we can readily glean competent evidence from the record that supports the trial judge's decision to close the courtroom. In *Guzman* and *English,* there was no such evidence.

which requires that a closure be "no broader than necessary" to protect the interest that justifies it, *id.*—is unpersuasive for the simple reason that the first prong of the test was indeed satisfied;

(3) the third prong of the *Waller* test—that "the trial court must consider reasonable alternatives to closing the proceeding," *id.*—was satisfied because the trial court was not obligated to consider *sua sponte* further alternatives to the narrow closure it ordered, and there is no exception to this rule for cases where the defendant's trial attorney is not at fault in failing to propose to the trial judge the alternative to closure he advocates on appeal; and

(4) the fourth prong of the *Waller* test—that the trial court must make findings "adequate to support the closure," *id.*—was satisfied because we can glean competent evidence from the record that justifies closure.

Accordingly, the judgment of the District Court is AFFIRMED.