**UNITED STATES of America Appellee**

**v.**

**Wendell SMITH Defendant–Appellant.**

**Docket No. 03–1588.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 4, 2005.

Decided: Oct. 17, 2005.

Lawrence L. Kasperek, Rochester, NY, for Defendant–Appellant.

Bradley E. Tyler, Assistant United States Attorney (for Michael A. Battle, United States Attorney for the Western District of New York), Rochester, NY, for Appellee.

Before: WINTER, SOTOMAYOR, B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

This appeal requires us to consider whether post-September 11th security measures implemented by the United States Marshals Service at the entrance to a federal building complex in Rochester, New York containing courtrooms and other non-judicial governmental facilities violated Defendant–Appellant Wendell Smith's First or Sixth Amendment rights. We hold that Smith's Sixth Amendment right to a public trial was not violated by the requirement that court visitors show photo identification because the security measures effected at most a partial closure of Smith's trial that satisfied the four-part test articulated in *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). We also reject Smith's First Amendment claim because to the extent his Sixth Amendment claim fails, his First Amendment claim also fails. Consequently, we affirm his conviction for unlawful possession of a weapon under 18 U.S.C. § 922(g)(1), and we remand for proceedings consistent with *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005). We are, however, concerned by the Marshals Service's restriction of court access and wish to underscore the primary role of the courts in controlling access to premises containing courtrooms.

## BACKGROUND

Wendell Smith was arrested in June 2002 and charged with one count of possession of a firearm and ammunition by a convicted felon. *See* 18 U.S.C. § 922(g)(1). A three-day jury trial in the United States District Court for the Western District of New York (Siragusa, *J.*) concluded with a guilty verdict and Smith was sentenced

principally to 46 months' imprisonment and three years' supervised release.

Smith's trial was held in the United States District Court in Rochester, New York, which is part of the Kenneth B. Keating Federal Building complex. At the entrance to the building is a security station staffed by security personnel supervised by the Marshals Service. On February 7, 2003, pursuant to a directive from the Director of the Marshals Service, the Marshals Service, in conjunction with the Department of Homeland Security (DHS), began requiring all unknown building visitors to show photo identification before passing through magnetometers.

On the third day of trial, counsel for Defendant moved for a mistrial on the grounds that Defendant's First and Sixth Amendment rights to public trial were violated by the requirement that visitors to the federal building show photo identification. Smith's counsel submitted an affidavit which vaguely claimed "[u]pon information and belief" that members of Smith's family, members of counsel's investigative staff, and members of the general public had been prevented from attending his jury trial as a result of the photo identification policy. Counsel did not provide any additional specific information regarding those who were allegedly denied access due to the photo identification policy. After closing arguments, the district court excused the jury and called Marshal Peter Lawrence to the stand to explain the photo identification requirement.

Marshal Lawrence testified that the requirement of showing a photo identification was part of a new policy implemented after the events of September 11, 2001, to protect federal buildings and courthouses. Under the policy, there are five numerical security levels, which correspond with the five color levels established by DHS. When the national alert level is 3 (yellow) or 4 (orange), Marshals must perform a photo identification check of all individuals seeking access to federal buildings. Because the national alert level at the time of Smith's trial was 3, every person seeking access to the building who was unknown to security personnel was checked for photo identification and asked to sign-in. Individuals who could not produce a photo identification were denied entry. Marshal Lawrence testified that individuals were not asked for identification on the basis of race, national origin, or any other discriminatory ground.

Marshal Lawrence further testified that there was no "watch list" against which security personnel checked the names; therefore, any person who could produce a form of photo identification was permitted to enter the federal building containing courtrooms. Furthermore, it was left to the discretion of security personnel to determine whether an individual was sufficiently identified by the identification he or she tendered.

At the conclusion of the hearing, the district court made the following findings: (1) after September 11, 2001, the Marshals Service, in conjunction with DHS, adopted heightened security measures; (2) alert levels 3 and 4 require all unknown individuals to show photo identification in order to receive access to federal buildings; (3) such a policy "on a common sense basis" makes "perfect sense" because "[s]omeone who is forced to identify themselves is less likely to pose a threat than someone who is allowed to walk into the building without any at all;" (4) the policy was enforced without regard to race, ethnicity, or other improper classifications; and (5) where the district court did not itself restrict trial access, the Defendant's Sixth Amendment right to a public trial was not implicated. The district court did not permit Smith to put on testimony showing that anyone had actually been excluded by the security

measures, and the district court ultimately declined to order a mistrial. On appeal Smith contests this ruling.

## DISCUSSION

We review the district court's legal conclusions *de novo, see United States v. Doe,* 63 F.3d 121, 125 (2d Cir.1995), and its denial of a mistrial for abuse of discretion. *See United States v. Carson,* 52 F.3d 1173, 1188 (2d Cir.1995). "However, because the district court's discretion is significantly circumscribed by constitutional principles set forth by the Supreme Court, this court's review is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." *Doe,* 63 F.3d at 125 (internal quotations omitted).

## I. Sixth Amendment

The Sixth Amendment provides, *inter alia,* that "the accused shall enjoy the right to a ... public trial." U.S. Const. amend. VI. Nevertheless, a criminal defendant's right to a public trial "may give way in certain cases to other rights or interests." *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). In *Waller,* the Supreme Court established a four-prong test for determining when an abridgement of a defendant's Sixth Amendment public trial right is justified. *See id.* at 48, 104 S.Ct. 2210. Under *Waller,* a courtroom closure does not rise to the level of a Sixth Amendment violation if: (1) closing the hearing would advance an overriding interest that is likely to be prejudiced; (2) the closure is no broader than necessary to protect that interest; (3) the trial court considers reasonable alternatives to closing the proceeding; and (4) the trial court makes findings adequate to support the closure. *Id.; see Ayala v. Speckard,* 131 F.3d 62, 69 (2d Cir.1997) (en banc).

Although *Waller* concerned the complete closure of a courtroom to the public for the duration of a hearing, this Circuit and others have held that where a narrow, "partial closure" occurs, the first *Waller* factor is less rigorous. In such cases, there must only be a "substantial reason," rather than an "overriding interest" justifying the closure. *Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992); *see also United States v. Sherlock,* 962 F.2d 1349, 1357 (9th Cir.1992) (as amended); *Nieto v. Sullivan,* 879 F.2d 743, 753 (10th Cir. 1989); *Douglas v. Wainwright,* 739 F.2d 531, 533 (11th Cir.1984). We have considered a variety of factors in determining whether a closure is broad or narrow, including "its duration, whether the public can learn what transpired while the trial was closed (e.g. through transcripts), whether the evidence was essential, and whether selected members of the public were barred from the courtroom, or whether all spectators were excluded." *Carson v. Fischer,* 421 F.3d 83, 89–90 (2d Cir.2005) (citing *Bowden v. Keane,* 237 F.3d 125, 129–30 (2d Cir.2001)).

■ Here, however, the district court never reached the question of whether even a narrow closure occurred; instead, it concluded that Smith's Sixth Amendment rights were not implicated because the district court itself had not denied anyone courtroom access. We believe the district court erred in assuming that a defendant's Sixth Amendment rights cannot be violated unless a court itself restricts courtroom access. First, although cases involving the right to a public trial commonly arise in the context of courts entering formal closure orders, we believe that measures that limit the public's access to federal buildings with courtrooms where public trials may be occurring implicate Sixth Amendment concerns. At least one other circuit has concluded that the Marshals Service's *sua sponte* act of requiring spectators to produce photo identification before enter-

ing a trial triggered a Sixth Amendment inquiry. *See United States v. DeLuca,* 137 F.3d 24, 32–35 (1st Cir.1998). Second, even if the district court did not itself initially enact the screening procedures, as discussed below, the district court, not the Marshals Service, controlled access to the courtrooms and ultimately ratified the screening proceeding by concluding that they were constitutionally permissible. *See id.* at 35. We see no principled reason why a district court's ex-post approval of such security measures should be immune from Sixth Amendment inquiry simply because the district court did not initially implement them.

Third, more important than *who* enacts restrictions on courtroom access is the question of whether those restrictions implicate the values that the Sixth Amendment's public trial guarantee aims to protect. In *Peterson v. Williams,* 85 F.3d 39 (2d Cir.1996), we discussed four values advanced by the public trial guarantee: "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Id.* at 43 (citing *Waller,* 467 U.S. at 46–47, 104 S.Ct. 2210). Here, the record provides no evidence indicating what percentage of the public lacks photo IDs and consequently would be prevented from attending criminal trials as a result of the Marshals Service's security measures. Therefore, we decline to assume that a requirement of showing photo ID at the

door of a federal building containing courtrooms would not implicate the values identified in *Peterson.*

We turn, then, to *Waller* to determine whether Smith's Sixth Amendment rights were violated. At oral argument, the government conceded—we think appropriately—that the requirement of showing photo identification at the door to the federal building effected at least a "partial closure" of Smith's trial.[1] We further agree with the government, however, that the closure of Smith's trial was at most "partial," since the security measures "(1) barred only those would-be spectators who opted not to submit written identification, and (2) presumably may have 'chilled' attendance by some potential spectators who opted not to present themselves at the courthouse." *DeLuca,* 137 F.3d at 33–34; *see also United States v. Brazel,* 102 F.3d 1120, 1155–56 (11th Cir.1997); *cf. Woods,* 977 F.2d at 74 (finding "partial" closure where members of defendant's family were excluded while particular witnesses testified).

As already noted, the first prong of the *Waller* test is relaxed in situations involving a partial rather than a complete closure; the partial closure must be justified only by a "substantial reason" that is likely to be prejudiced in the absence of the closure. *See Guzman v. Scully,* 80 F.3d 772, 775 (2d Cir.1996); *Woods,* 977 F.2d at 76. Smith admits that "[t]he government's ongoing promotion of security and prevention of terrorism certainly im-

---

1. In its brief on appeal, the government initially took the position that the requirement of showing photo identification did not effect a courtroom closure because it was merely a "universal pre-condition to courtroom access" analogous to a magnetometer screening. Appellee's Br. at 11. As the First Circuit noted in *DeLuca,* "no one would suggest" that magnetometer screenings violate the Sixth Amendment. *DeLuca,* 137 F.3d at 33.

However, rather than finding that the screening procedures enacted by the Marshals Service did not effect a closure, the First Circuit concluded in *DeLuca* that they "amounted at most to a permissible 'partial closure.'" *Id.* at 33; *see also Brazel,* 102 F.3d at 1155 (assuming, *arguendo,* that similar identification procedures constituted a "partial" closure). At oral argument, the government opted for the same position.

plicates a compelling state interest," but argues that because the record "fails to support any connection between the goal of preventing a terror attack[ ] and prohibiting those unable or unwilling to produce photographic identification from admission, the state interest is not advanced by the method employed." Appellant's Br. at 27.

In analyzing the first prong, we have repeatedly observed that a "positive correlation" exists between the extensiveness of the closure requested, and the gravity of the interest asserted and likelihood that the interest will be advanced by the closure. *Brown v. Kuhlmann,* 142 F.3d 529, 538 (2d Cir.1998); *see Bowden,* 237 F.3d at 129. Thus,

> if a party seeks a broad closure, it must demonstrate that the interest . . . is especially grave, and that the risk that would be posed . . . by not closing the courtroom is more than serious. Conversely, if a party seeks a relatively narrow courtroom closing, the burden it must carry is not a heavy one.

*Id.* (internal quotation marks and citation omitted). Because the closure at issue is quite narrow—only those individuals who were unwilling or unable to show photo identification were allegedly excluded from Smith's trial—we need not demand compelling record evidence that the goal of preventing a terrorist attack is advanced by requiring individuals to show photo identification. Indeed, the district court's "common sense" conclusion that "[s]ome-

one who is forced to identify themselves is less likely to pose a threat than someone who is allowed to walk into the building without any at all" satisfies this undemanding inquiry.

▪ Under the second prong of the *Waller* test, the closure must not be broader than necessary to protect the asserted interest. *See Waller,* 467 U.S. at 48, 104 S.Ct. 2210. As we explained in *Bowden,* "[o]ur adoption in *Ayala* of a sliding scale approach to the first *Waller* factor means that there will not always be a meaningful analytic distinction between the first and second prongs." *Bowden,* 237 F.3d at 130. Because the photo identification requirement effected a very narrow closure, we cannot conclude that any restriction on access to Smith's trial was broader than necessary to advance the security interest at stake.[2]

▪ The third prong requires a trial court to consider reasonable alternatives to closing the proceedings. *See Waller,* 467 U.S. at 48, 104 S.Ct. 2210. However, once a limited closure is deemed warranted, it is the obligation of the party opposing the closure to suggest possible alternatives. *Ayala,* 131 F.3d at 71. A court need not "*sua sponte* consider further alternatives to the alternative deemed appropriate." *Id.* Smith takes issue with the district court's conclusion that the alleged exclusion of members of his family, his counsel's staff, and the public was warranted as a way to advance the interest of

---

2. In an affidavit, Smith's counsel averred, upon "[i]nformation and belief," that Smith's family members and others were excluded by the photo identification requirement. "[T]his Court takes very seriously a defendant's right to have family members and friends present at his trial." *Carson,* 421 F.3d at 91. Consequently, where a defendant has argued that his Sixth Amendment rights were violated by the exclusion of specific family members, we have required particularized findings justifying those family members' exclusion before concluding that a closure was no broader than necessary. *See, e.g., Sevencan v. Herbert,* 342 F.3d 69 (2d Cir.2003); *Yung v. Walker,* 341 F.3d 104 (2d Cir.2003); *English v. Artuz,* 164 F.3d 105 (2d Cir.1998); *Guzman,* 80 F.3d at 776–77; *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994). Here, however, counsel's affidavit, which fails to identify any family members who were excluded and is not based on personal knowledge, is so vague that a particularized inquiry is unwarranted.

courthouse security. The affidavit by Smith's counsel adverted only vaguely and on "information and belief" that interested parties were excluded as a consequence of the commonly employed identification requirement. Moreover, he did not propose to the district court alternative ways of achieving that interest without resort to closure. Because this showing was inadequate to trigger additional inquiry by the district court, which had no obligation to consider alternatives *sua sponte*, the third factor was met.

■ Finally, the fourth prong requires the trial court to "make findings adequate to support the closure." *Waller,* 467 U.S. at 48, 104 S.Ct. 2210. These findings must ordinarily support the *"particular* courtroom closing ordered by the trial judge." *Bowden,* 237 F.3d at 131 (emphasis in original). Here, however, the fact that there is no evidence to suggest that special security measures were needed in Smith's "particular" trial for possession of a firearm by a convicted felon is beside the point. The security measures that caused a partial closure of Smith's trial were enacted to protect against a broad terrorist threat to the entire federal building. Smith does not contend any one who was permitted to enter the federal building was restricted in any way from attending his trial.

For those reasons, we conclude that the fourth prong was satisfied. In *Huminski v. Corsones,* 396 F.3d 53 (2d Cir.2005), we held that the requirement of particularized findings under the fourth *Waller* prong may be relaxed where the unique circumstances of a closure do not reasonably lend themselves to such findings.[3] *Huminski,* 396 F.3d at 86–87. We explained that: [w]hen a judge, in the relative calm of chambers, issues [a closure] order, for

example, the requirement of particularized findings obtains. In that context, findings are a necessary safeguard against arbitrary judicial abridgement of the constitutional right. But when the decision is made by an administrative or law-enforcement officer in the lobby of a courthouse, adherence to what in those circumstances would be the anomalous formality of the particularized findings cannot reasonably be expected.

*Id.* at 87. Here, too, we believe that the requirement of particularized findings is unjustified, since the post-September 11th security measures were adopted by the Marshals Service and DHS to address a generalized threat. *See id.* Moreover, we have noted that "[t]he quality and extent of the evidence that will support a closure . . . will vary from case to case, depending on the scope of the closure." *Bowden,* 237 F.3d at 131; *see also Brown,* 142 F.3d at 538. Given the limited nature of the closure of Smith's trial, we conclude that the district court's findings that after September 11th the Marshals Service and DHS had adopted heightened security measures, and that levels 3 and 4 required showing photo identification, fulfilled the requirements of the fourth prong. Accordingly, we conclude that the *Waller* test has been satisfied and that the partial closure of Smith's trial did not violate his right to a public trial.

## II. First Amendment

Smith also claims that the partial closure violated his "First Amendment right to a public trial." Br. of Appellant at 22. A defendant's right to a public trial is most clearly rooted in the Sixth Amendment. *See Waller,* 467 U.S. at 46, 104 S.Ct. 2210. The First Amendment, by contrast, has

---

**3.** *Huminski* involved the First Amendment right of a member of the public to courthouse access, but as explained in Part II, *infra,* "[t]he same test applies whether a closure

motion is made . . . over the defendant's Sixth Amendment objection or . . . over the First Amendment objection of the [public] or press." *Doe,* 63 F.3d at 128.

consistently been read to provide the *public and press* a right of access to criminal trials. *See id.; Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603–06, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (citing, *inter alia, Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 558–81, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)); *Ayala*, 131 F.3d at 69. As the Court explained in *Globe Newspaper*, "[u]nderlying the First Amendment right of access to criminal trials is the common understanding that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Globe Newspaper*, 457 U.S. at 604, 102 S.Ct. 2613. By providing access to criminal trials, the First Amendment ensures that the individual citizen can knowledgeably participate in such discussions. *See id.* at 605–06, 102 S.Ct. 2613. At the same time, "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process." *Id.* at 606, 102 S.Ct. 2613.

In *Waller*, the Supreme Court found it unnecessary to decide whether a defendant may bring a claim to an open trial under the First Amendment because it had already concluded that Waller's Sixth Amendment rights had been violated. *See Waller*, 467 U.S. at 39, 47 n. 6, 104 S.Ct. 2210. The Court has since remained silent on this question, and our Court has not addressed the issue.[4]

██ We, too, need not decide whether Smith could bring a First Amendment open trial claim (either on his own behalf or to vindicate the rights of the public and press), for even assuming he could, "[t]he same test applies whether a closure motion is made ... over the defendant's Sixth Amendment objection or ... over the First Amendment objection of the government or press." *Doe*, 63 F.3d at 128; *see also Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (articulating the test for when the presumption of openness under the First Amendment may be overcome).[5] Accordingly, our holding above that the partial closure of Smith's trial was justified under *Waller* also resolves his First Amendment claim.

## III. Control of Court Access

Although we conclude that Smith's constitutional rights were not violated by the imposition of a photo identification require-

4. *United States v. Alcantara*, 396 F.3d 189 (2d Cir.2005), is not an exception. There, one of the defendants brought a Sixth Amendment challenge to the district court's decision to conduct plea and sentencing hearings in the robing room rather than in open court. *See id.* at 193. Although no members of the public or press complained, we concluded that conducting the proceeding in the robing room violated the public and press's First Amendment rights. *See id.* at 202–03. We reasoned that the district court had failed to comply with *In re The Herald Co.*, 734 F.2d 93, 102 (2d Cir.1984), which established mandatory procedures for providing notice to the public in the event of a courtroom closure. *See Alcantara*, 396 F.3d at 202–03. In remanding for new plea and sentencing proceedings, we stressed that because the district court's error "harm[ed] the integrity of the federal judicial system as a whole," we were exercising our

"supervisory powers" based on the "unique circumstances" of the case. *Id.* at 203. Because we relied on our "supervisory powers" and the defendant only raised a Sixth Amendment claim, we never considered whether a defendant could bring a First Amendment open trial claim either on his own behalf or to vindicate the rights of the public and press.

5. We note that *Doe* and other cases have only expressly considered the standard applicable to the First Amendment rights of the public and press. Nevertheless, we can see no reason why, to the extent a defendant may press a First Amendment claim on his own behalf (an issue we do not decide), the standard for analyzing such a claim would differ in any way from that of the public and press. Nor has Smith provided any reason for believing the standards would differ.

ment, we note our concerns about unilateral steps—even commonsensical and fully justified ones—by the executive branch that restrict court access. Going forward, we emphasize that any such steps must be coordinated with, and approved by the courts. While the Marshals Service and Secretary of DHS are charged by Congress with protecting the federal courts, *see* 28 U.S.C. § 566; 40 U.S.C. § 1315, the Supreme Court has made clear that "courtroom and courthouse premises are subject to the control of the court." *Sheppard v. Maxwell,* 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *see also Westmoreland v. CBS, Inc.,* 752 F.2d 16, 24 n. 13 (2d Cir.1984) ("the judiciary . . . has always had control over the courtrooms"); *Brewster v. Bordenkircher,* 745 F.2d 913, 916 (4th Cir.1984) ("It is [the district judge] who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes.").

Control by the courts is essential, because the judiciary is uniquely attuned to the delicate balance between defendants' Sixth Amendment rights to public trial, the public and press's First Amendment rights to courtroom access, and the overarching security considerations that are unique to the federal facilities containing courtrooms. Because of these factors, special concerns arise when security measures that seem obvious or commonplace in some settings are transferred to the door of such facilities. The judiciary is uniquely competent to strike the proper balance. It is especially important that the judiciary maintain control of security measures that may affect those having business before the courts, because of the danger that litigants could be excluded from the courtroom and procedurally penalized for their absence through no fault of their own and without the knowledge of the court. For

these reasons, we expect the Marshals Service to consult with the courts before implementing general security measures that significantly affect court access. Such restrictions should then be approved by the judiciary through, for example, their relevant court security committees.

## IV. *Crosby* Remand

Because Smith's appeal was pending before this Court when the Supreme Court issued *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and Smith has indicated his desire for a remand pursuant to *United States v. Crosby,* 397 F.3d 103 (2005), we remand for further proceedings in conformity with *Crosby.* Any appeal taken from the district court following this remand can be initiated only by filing a new notice of appeal. *See* Fed. R.App. P. 3, 4(b).

## CONCLUSION

For the reasons provided, the judgment of the district court is AFFIRMED, and REMANDED for proceedings consistent with *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005).