13-2363-cr
*United States v. Ledee*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2013

ARGUED: APRIL 30, 2014
DECIDED: AUGUST 8, 2014

No. 13-2363-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

MICHEAL LEDEE, ALSO KNOWN AS NYCRICANMIKE, ALSO KNOWN AS
MICHAEL LEDEE,
*Defendant-Appellant.*

————

Appeal from the United States District Court
for the Eastern District of New York.
No. 11-cr-175 – Nicholas G. Garaufis, *Judge*.

————

Before: WALKER, POOLER, and WESLEY, *Circuit Judges*.

————

Defendant-appellant Micheal Ledee was convicted of crimes

stemming from participating via webcam in the sexual abuse of an

eight-year-old girl by her mother. To ensure the uninhibited testimony of the underage victim at trial, the district court (Nicholas G. Garaufis, *Judge*), on motion by the government, closed the courtroom during the victim's testimony to all persons who were not directly involved in the trial, including Ledee's parents. Ledee argues that the closure violated his Sixth Amendment right to a public trial. We disagree and AFFIRM.

Judge Pooler dissents in a separate opinion.

————

TIANA A. DEMAS, (Susan Corkery, *on the brief*), Assistant United States Attorney, *for* Loretta E. Lynch, United States Attorney, United States Attorney's Office for the Eastern District of New York, Brooklyn, N.Y., *for Appellee*.

DAVID A. LEWIS, New York, NY, *for Defendant-Appellant*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Defendant-appellant Micheal Ledee was convicted of crimes stemming from participating via webcam in the sexual abuse of an eight-year-old girl by her mother. To ensure the uninhibited testimony of the underage victim at trial, the district court (Nicholas G. Garaufis, *Judge*), on motion by the government, closed the courtroom during the victim's testimony to all persons who were

not directly involved in the trial, including Ledee's parents. Ledee argues that the closure violated his Sixth Amendment right to a public trial. We disagree and AFFIRM.

Judge Pooler dissents in a separate opinion.

## BACKGROUND

On April 15, 2010, Detective Matt Messer, then a major crimes detective in the Grant County Sherriff's Department in Washington State, received a tip that an unidentified person was communicating online with a mother in Washington who had disseminated a nude photo of her eight-year-old daughter and wanted to involve the daughter in sexual acts. Detective Messer located and interviewed the mother, who admitted to sexually abusing her daughter—whom we identify as KO to protect her privacy—for the past few months and regularly using a webcam to broadcast the abuse online. Detective Messer then executed a search warrant at KO's mother's apartment and seized a desktop computer and a webcam.

On May 26, 2010, and again on June 11, FBI agents logged in to KO's mother's Yahoo instant messenger account. On both occasions, the agents found an unread message sent by defendant-appellant Micheal Ledee to KO's mother. The first message read "YW [you're welcome] . . . I would definitely put the tip of my dick in her and put my whole [d]ick inside you." Gov't App. 144. The

3

second message read "[d]amn, my dick is so hard when I see you []
and your daughter that night was hot [] I hope I get to see the both
of you again." Gov't App. 163.

In June 2010, the FBI forensically examined KO's mother's
computer and found the saved transcript of her recent Yahoo instant
messenger chats. It showed that on May 24, 2010, Ledee asked KO's
mother to show KO to him; that KO's mother then accepted Ledee's
webcam invitation such that they could see each other live via
webcam; and that Ledee expressed approval at seeing KO on the
webcam. Ledee also asked KO's mother if "she looking," to which
KO's mother replied yes. Gov't App. 224. Ledee then said "how[']s
the booty," "looking hot," "finger her mommy," "that[']s really
nice," "i think my dick would fit good in there," and "[I']m glad
[you] showed me." *Id*. at 225. The next day, Ledee told KO's
mother on instant messenger that "[you] and [your] daughter are
very hot . . . she has a nice body." *Id*.

On February 3, 2011, FBI agents executed a search warrant at
Ledee's apartment in Brooklyn, during which Ledee voluntarily
agreed to speak to the agents. Ledee said that he met KO's mother
online in early May 2010 in a chat room called "married but
looking." Ledee admitted that during his May 24, 2010 chat with
KO's mother, he directed her to have KO undress and to have her

4

sexually touch KO. Ledee also admitted that he was masturbating during the chat session and could see KO's mother sexually abusing KO via the webcam. Ledee signed a written statement reflecting what he told the FBI agents and also initialed a transcript of the May 24 instant messenger chat.

In an indictment filed March 22, 2012, Ledee was charged with conspiracy to sexually exploit a child (18 U.S.C. §§ 2251(e), 3551 *et seq.*), sexual exploitation of a child (18 U.S.C. §§ 2251(a), (e), 3551 *et seq.*), and receipt of child pornography (18 U.S.C. §§ 2252(a)(2), 2252(b)(1), 3551 *et seq.*).

On March 30, 2012, prior to trial, the government moved to close the courtroom during KO's testimony pursuant to 18 U.S.C. § 3509(e). Section 3509(e) permits such closure, on conditions which the government argued were met, to all persons "who do not have a direct interest in the case." In support, the government submitted an affidavit from KO's father and legal guardian, who has had custody of KO following her mother's arrest. KO's father stated that although KO is normally outgoing, she is uncomfortable speaking in private about her sexual abuse and has said that she does not want to testify with members of the public and the press present in the courtroom. KO's father further stated that KO is aware that men witnessed her sexual abuse online and that after her mother's arrest

was covered by the local news in KO's hometown, people would stop KO to express sympathy, which caused KO to break down in tears. Finally, KO's father stated that he did not believe that KO would be able to communicate effectively if the courtroom were not closed.

At a subsequent pre-trial conference, Ledee orally opposed the motion to the extent that it would bar Ledee's parents from the courtroom during KO's testimony. The district judge asked the government whether KO's father would object to Ledee's parents being present and, after a short recess to confirm with KO's father, the government told the district judge that he did object. The district judge also asked the public if anyone would like to voice support or objection to the closure motion and received no response. The district judge then orally granted the government's motion to close the courtroom during KO's testimony and, on April 9, 2012, filed a Memorandum & Order explaining his decision. *United States v. Ledee*, No. 11-cr-175, 2012 WL 1247222 (E.D.N.Y. Apr. 9, 2012). The district judge held that ensuring KO's uninhibited testimony was an overriding interest that would likely be prejudiced unless the courtroom were closed and that such closure during KO's testimony would be no broader than necessary to protect that interest. *Id*. at *2.

At trial and just prior to KO testifying, the district judge asked everyone in the gallery to leave the courtroom and confirmed with the parties that everyone remaining in the courtroom had a direct interest in the case. At least twenty-five people remained, including court staff, the legal teams, the jurors and alternates, and KO's father. After KO's testimony, the district judge reopened the courtroom to the public. The district court did not restrict the subsequent preparation and dissemination of the transcript that included KO's testimony.

Following trial, the jury found Ledee guilty of all three counts. The district judge sentenced Ledee to 325 months' imprisonment and lifetime supervised release.

Ledee now appeals here.

### DISCUSSION

This appeal raises the single issue of whether, by excluding the defendant Ledee's parents from the trial during the victim's testimony, the district court violated Ledee's right to a public trial under the Sixth Amendment.

We "examine the district court's findings of fact for clear error, its legal determinations *de novo*, and its ultimate decision to deny or grant a motion for closure for abuse of discretion." *United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995). But "because the district

7

court's discretion is significantly circumscribed by constitutional principles set forth by the Supreme Court, this court's review is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." *Id*. (internal quotation marks omitted).

Under the pertinent statute, a district court may close the courtroom to everyone who "do[es] not have a direct interest in the case" when a child victim of physical or sexual abuse testifies if the court determines that not doing so would "cause substantial psychological harm to the child or would result in the child's inability to effectively communicate." 18 U.S.C. § 3509(e). But the Constitution of the United States circumscribes this discretion. The Sixth Amendment provides, in relevant part, that "the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. This right, however, "may give way in certain cases to other rights or interests. . . . Such circumstances will be rare, . . . and the balance of interests must be struck with special care." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). In order to close the courtroom in compliance with the Sixth Amendment, (1) the closure must "advance an overriding interest that is likely to be prejudiced"; (2) the closure must be "no broader than necessary to protect that interest"; (3) the trial court must consider "reasonable alternatives to closing the

8

proceeding"; and (4) the trial court must make "findings adequate to support the closure." *United States v. Smith*, 426 F.3d 567, 571 (2d Cir. 2005) (citing *Waller*, 467 U.S. at 48).

I.      **The Interest Prejudiced**

Notwithstanding that the closure must "advance an overriding interest that is likely to be prejudiced," the more extensive the closure that is sought, the greater the burden on the party seeking closure. *See Doe*, 63 F.3d at 128-29. "[I]f a party seeks a broad closure, it must demonstrate that the interest that the closure would purportedly serve is especially grave, and that the risk that would be posed to that interest by not closing the courtroom is more than serious." *Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001) (internal quotation marks omitted). "When limited closure . . . is at issue, the prejudice asserted need only supply a 'substantial reason' for closure." *Doe*, 63 F.3d at 129.

The interest at risk of being prejudiced—KO's ability to effectively communicate about her abuse—was sufficient to justify the relatively narrow closure here. Indeed, "ensuring a child victim's ability to effectively communicate is [] a compelling higher value that can justify a closure." *United States v. Yazzie*, 743 F.3d 1278, 1287 (9th Cir. 2014). Because the closure at issue is a relatively narrow one, as we discuss in more detail below, "we need not

demand compelling record evidence that" the goal of communicating effectively is advanced by closing the courtroom to the public during KO's testimony. *Smith*, 426 F.3d at 573. All we need conclude, as we do here, is that the "district court's common sense conclusion" that KO would likely not be able to communicate effectively in an open courtroom "satisfies this undemanding inquiry." *Id*.

The Supreme Court's decision in *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982), does not compel a different result. There, the Court held that a Massachusetts state law barring the press and public from trials during the testimony of minor sex-offense victims violated the First Amendment's guarantee of the right to access criminal proceedings. *Id*. at 602. The Court found that the law could not be justified on the basis of encouraging minor victims to provide accurate testimony because it was not shown that mandatory closure would always further such an interest. *Id*. at 609-10. Here, however, we are not dealing with a generally applicable law that mandates closure in every case, but rather a tailored closure as applied to one eight-year-old sex-abuse victim (ten years old at the time of trial) under the circumstances of this case. Indeed, the district court here relied on an affidavit from KO's father that was "based on specific instances

10

he has observed, and the effect press coverage has had on KO in the past, rather than a generalized or projected fear or discomfort." *Ledee*, 2012 WL 1247222, at *1.

## II.    The Breadth of the Closure

The closure must be no broader than necessary to protect the proffered interest. *Bowden*, 237 F.3d at 130.  Here, the closure was not broad.  *See id*. at 129-130 (providing that whether a closure is broad or narrow depends on factors including its duration, whether transcripts of the closed proceedings are made available, and whether the closure applied to selected persons or the entire public). Although the closure barred the general public, it applied only during KO's testimony, not to any other aspect of the trial, and the government did not object to the transcript of KO's testimony being made available to the public. *Ledee*, 2012 WL 1247222, at *2.

Ledee argues that the closure was broader than necessary because the inclusion of two additional spectators—Ledee's parents—would not have prejudiced KO's ability to testify.  We do not believe the district judge erred in determining the breadth of the closure here.  Excluding all of the public, including Ledee's parents, allowed the district judge to tell KO when she took the stand that "all the people who are here[] are people who have to be here . . . [o]therwise, everyone's been excluded," Appellant App. 53, as was

11

reasonably necessary to encourage KO's effective communication.  A certain amount of line drawing is inherent in any closure decision. Here, the district judge reasonably confined the closure to those who were not necessary to the functioning of the trial.

### III.    Reasonable Alternatives to Closure

"[T]he trial court must consider reasonable alternatives to closing the proceeding."  *Waller*, 467 U.S. at 48.  And a trial court must do so even when alternatives are not offered by the parties. *Presley v. Georgia*, 558 U.S. 209, 214 (2010) (per curiam).  Ledee contends that the district court here erred by not considering any alternatives to closure.  We disagree.

The district court, in granting the government's motion to close the courtroom, stated that "[t]he parties have not advised the court of any reasonable alternatives to the courtroom closure, and the court is not aware of any."  *Ledee*, 2012 WL 1247222, at *2.  Ledee now suggests two alternatives that he claims the district judge should have considered: relocating seating in the courtroom to make Ledee's parents inconspicuous to KO when testifying and allowing Ledee's parents to view KO's testimony from a different room via closed circuit television.

The district court did not have a duty to consider these alternatives, however, because they are not *reasonable* solutions for

ensuring that KO would be an uninhibited and effective witness. *See Waller*, 467 U.S. at 48 (reasonable alternatives to closure must be considered). KO's father's affidavit established that KO had a particularized emotional fear of others witnessing the story of her sexual abuse. *See* Appellant App. 140-42. It caused KO to "break down in tears" when residents of her hometown heard of her abuse and expressed sympathy to her in public. *Id*. at 142. Neither placing Ledee's parents in inconspicuous seats nor allowing them to watch KO's testimony on closed circuit television would have permitted the district judge to tell KO that no nonessential persons were witnessing her testimony. In other words, because of KO's particularized emotional trauma, the district court did not err in concluding that there were no reasonable alternatives to closure to ensure that KO would be able to communicate effectively.

Because a district court has the duty to *sua sponte* consider reasonable alternatives to closure, *see Presley*, 558 U.S. at 214, we think it best practice for the district court to err on the side of caution by considering the widest possible array of alternatives. But because Ledee has posited no identifiable reasonable alternatives to closure here, and we can think of none, we find no error in this regard.

13

## IV.    Factual Findings in Support

Finally, the district court must "make findings adequate to support the closure." *Waller*, 467 U.S. at 48. Such findings must "support the particular courtroom closing ordered by the trial judge." *Smith*, 426 F.3d at 574 (internal quotation marks and emphasis omitted).

Here, the district judge, relying on an affidavit from KO's father, made particularized findings adequate to support closing the courtroom during KO's testimony. The district judge acknowledged that simply a parent's opinion about his or her child's ability to testify would be an insufficient justification. *See Ledee*, 2012 WL 1247222, at *2. Instead, the district judge credited KO's father's evaluation of KO's emotional state because it was "based on specific instances he has observed, and the effect press coverage has had on KO in the past, rather than a generalized or projected fear or discomfort." *Id*. at*1. Moreover, KO's father's affidavit established that KO was old enough to understand the consequences of having the press and public present in the courtroom, supporting the efficacy of the narrow closure in this case. Appellant App. 141, ¶ 8.

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.

POOLER, *Circuit Judge*:

I respectfully dissent. The district court, in contravention of Supreme Court precedent, failed to make an adequate record as to what alternatives to closure it considered and why those alternatives were deemed inadequate.

"In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. The Supreme Court teaches that in criminal cases, there is a presumption that the courtroom will be open to the public. *See Press-Enterprise Co. v. Superior Court of Calif.*, 464 U.S. 501, 509-10 (1984). This presumption is rebuttable, but courtroom closings "must be rare and only for cause shown that outweighs the value of openness." *Id.* at 509. Thus:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Waller v. Georgia*, 467 U.S. 39, 45 (1984) (citation and internal quotation marks omitted).

"The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly." *Guzman v. Scully*, 80 F.3d 772, 776 (2d Cir. 1996). "[T]he Supreme Court

has specifically noted a special concern for assuring the attendance of family members of the accused." *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994); *see also In re Oliver*, 333 U.S. 258, 271-72 (1948) (defendant is "at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."). Thus, "[u]nder Waller and its progeny, courts must undertake a more exacting inquiry when excluding family members, as distinguished from the general public[.]" *Smith v. Hollins*, 448 F.3d 533, 539 (2d Cir. 2006) (citation omitted).

While the right to have family members present "may give way in certain cases to other rights or interests." *Waller*, 467 U.S. at 45, the majority fails to appreciate the difference between excluding the defendant's parents and excluding the general public and the press. But no one disagrees with the decision to close the courtroom to the press and general public. The majority finds that excluding Ledee's parents "allowed the district judge to tell KO when she took the stand that 'all of the people who are here[] are people who have to be here . . . [o]therwise, everyone's been excluded." Majority Op. at 12 (quoting App'x at 53). However, Ledee's parents were plausibly within the group of people "who have to be" in the courtroom, given the "special concern for

2

assuring the attendance of family members of the accused" to protect the defendant's Sixth Amendment rights. *Vidal*, 31 F.3d at 69.

That failing aside, my dissent rests primarily on the district court's failure to create a record of what reasonable alternatives to courtroom closure it considered, and why those alternatives were inadequate. Once a defendant objects to a courtroom closing, a trial court is required to consider reasonable alternatives to the closing, even in the absence of suggestions from the parties. *Presley v. Georgia* 558 U.S. 209, 214 (2010). Thus, "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id.* There is no question that in some cases, an "overriding interest that is likely to be prejudiced" will provide a basis for closing the courtroom, unable to be overcome by a reasonable alternative. But when that is the case, "the particular interest, and threat to that interest, must be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at 215 (internal quotation marks omitted).

No such record exists here. The sum total of the district court's analysis of this *Waller* factor consists of the following statement: "[t]he parties have not

advised the court of any reasonable alternatives to the courtroom closure, and the court is not aware of any." *United States v. Ledee*, No. 11-cr-175, 2012 WL 1247222, * 2 (E.D.N.Y. 2012). There is no indication in the record of what alternatives to barring Ledee's parents during KO's testimony the district court considered. Compounding this error, the majority goes on to conclude, on a bare record, that no reasonable alternatives exist based on (1) the two alternatives proposed by defense counsel on appeal; and (2) the majority's inability to come up with another alternative. Majority Op. at 13. The majority concludes that "[t]he district court did not have a duty to consider these alternatives . . . because they are not *reasonable* solutions for ensuring that KO would be an uninhibited and effective witness." *Id.* An appellate court should not, in the first instance, be determining what is and is not a reasonable alternative. *See, e.g., TIFD III-E, Inc. v. United States*, 666 F.3d 836, 842 (2d Cir. 2012) (noting that "an appellate court's conventional and salutary preference" is "for addressing issues after they have been considered by the court of first instance," as it "gives the appellate court the benefit of the district court's analysis").

We cannot tell from the bare record before us whether the district court considered these alternatives, or, indeed, if the district court considered any

4

alternatives to simply excluding Ledee's parents from the courtroom. Perhaps a screen would have allowed KO to testify with Ledee's parents in the courtroom, or perhaps his parents could have listened to her testimony via a live audio feed. KO did express to her father a generalized (and understandable) fear of the public and press witnessing her testimony. But the Sixth Amendment gives a criminal defendant the right to have the public witness his trial, and as discussed above a district court must make a particular effort to allow a defendant's family to stand witness. The record offers us nothing to review on appeal as to how the district court reached the conclusion that no reasonable alternatives to excluding Ledee's parents from the courtroom existed. Instead of affirming, I would remand with limited instructions directing the district court to set out its rationale as to what alternatives it considered and why it deemed those alternatives inadequate so that we may consider the issue of a possible Sixth Amendment violation on a full and complete record.

I am well aware that, as detailed in the majority opinion, the defendant here stood accused of horrific crimes against a child. I am also sympathetic to KO's father's desire to shield his daughter from further distress. Indeed, on a fully developed record, I may well have joined the majority. But I cannot escape

*Presley's* clear directive that the district court make findings as to why there are no reasonable alternatives to closing the courtroom to Ledee's parents, and as no such findings exist here, I respectfully dissent.